419 A.2d 1301

**PAMELA J. K.**

v.

**ROGER D. J., Appellant.**

Superior Court of Pennsylvania.

Argued March 13, 1980.

Filed May 9, 1980.

---

**6.** The subject matter governed by former Rule 4005(b) has now been transferred to Rule 4006(a).

Delano M. Lantz, Harrisburg, for appellant.

Marvin Rudnitsky, Selinsgrove, for appellee.

Before SPAETH, BROSKY and VAN der VOORT, JJ.

SPAETH, Judge:

This appeal arises from an order granting custody of appellant's daughter, Juliet, to appellee, her mother.

## —HISTORY OF THE CASE—

The parties were married on July 12, 1969, and lived in Sunbury, Pennsylvania, where appellant was a senior high school teacher, and appellee participated in semi–professional theatrical productions. Juliet was born on May 10, 1971, and is the only child of the marriage. Marital problems arose, and in the fall of 1973 the parties separated. Appellant remained in Sunbury; appellee took Juliet with her to New York. Appellant's consent to appellee's custody of Juliet was memorialized in a written agreement between the parties dated December 7, 1973. On January 4, 1974, appellee obtained a divorce from appellant.

From the date of the parties' separation until October 1975, Juliet was with appellee. During this period, appellee received from appellant $20 a week in support, which was supplemented by public assistance. Appellant visited Juliet occasionally. By September 1975, appellee had decided that to escape her poverty she would enlist in the armed services. When she was informed that she would not be allowed to keep Juliet with her during the initial six to eight months after enlistment, she asked appellant to assume temporary custody of Juliet for this period. Appellant refused, stating that he would take Juliet only if his custody were made "permanent." Appellee reluctantly acceded to appellant's terms, and on October 4, 1975, the parties entered into a

second written agreement, this one giving appellant "permanent custody" of Juliet. Soon thereafter Juliet moved into appellant's household.[1] About this time, appellee was accepted into the United States Navy on a delayed enlistment basis, and on May 7, 1976, she entered active service.

From October 1975 to the present, Juliet has been living with appellant, appellant's new wife, Susan, and Ryan, Susan's son by a previous marriage.[2] Also appellant and Susan have had a daughter, Brooke, who was four months old at the time of the hearings below. It is clear from the record that appellant has taken good care of Juliet. Juliet is doing well in school, has friends in the neighborhood, and appears to be happy. She has her own bedroom painted in her favorite colors and characters. She and Ryan, who is approximately eighteen months younger than she, are fast playmates, and she is proud of her new sister Brooke. Appellant has been a good father, who spends his evenings at home (except when he has a meeting to attend), takes his family on outings to state parks and the seashore, spends time playing with his children, organizes family activities, and is providing for Juliet's moral education. Furthermore, he has demonstrated qualities that are appropriate for Juliet to emulate. He has a record of public service as an athletic coach, a foster parent, and chairman of Juvenile Court Services, has voluntarily undergone potentially fatal surgery to donate one of his kidneys to his sister, and has been honored on several occasions as teacher of the year in his district. Susan, in her own right, has provided proper care for Juliet, and both she and appellant make a concerted effort to avoid favoritism in their relationships with their children. Although Susan works as a learning disabilities

1. The parties dispute at some length the reasonableness of appellant's demand to have "permanent custody" of Juliet and the voluntariness of appellee's consent. The acts of the parties in October 1975 are open to various interpretations, and their primary importance now is that they were committed and not the spirit in which they were committed, for as a result of the acts, Juliet entered appellant's household where she has since remained.

2. Since appellant has adopted Ryan, he is, by law, Juliet's half-brother.

teacher, her working conditions are such that she has been able to respond immediately to emergencies in her family.

Appellee does not question appellant's fitness as a parent. Her position is that appellant is not serving Juliet's best interests because he has unreasonably interfered with Juliet's right to visit and spend time with her. As appellee forcefully stated during the hearings below:

> I believe that I have been denied the right to see my child and that she has been denied the right to know me. I think that my position in her life has been blocked out, that I am invisible, and I am not regarded by her father and her step–mother. I am not taken into consideration and I believe that I have a great deal to offer Juliet . . .

Record at 79a.

To understand this statement, it is necessary to summarize the evidence regarding the visits that have (and have not) occurred between Juliet and appellee since appellant was given custody of Juliet.[3]

As already noted, Juliet moved into appellant's household in October 1975. The parties agreed that appellee would not see Juliet for several months after the move in order to allow Juliet time to adjust to her new surroundings. Appellee's first visit with Juliet was on December 14, 1975, for one day. Appellee then asked if she might see Juliet at Christmas, and appellant refused. Appellee then asked if she might have Juliet with her for a week in January, and appellant again refused. Appellant claimed the visits would be psychologically damaging for Juliet. Appellee then secured legal counsel to protect her right to visit Juliet. Through counsel's intervention, appellant ultimately permitted appellee to have Juliet from January 31 to February 8, 1976. It is noteworthy that at one point during the negotia-

---

**3.** Throughout this opinion we use the word "visit" in its everyday sense, as meaning any meeting between appellee and Juliet, and not in its technical sense as a word of art in child custody law, where it may be necessary to distinguish between a "visit" and "partial custody." *See Scott v. Scott,* 240 Pa.Super. 65, 69, 368 A.2d 288, 291 (1976) (SPAETH, J. concurring).

tions between the parties concerning this visit, appellant suggested that appellee should take Juliet back permanently. Several days later, when appellee accepted the suggestion, appellant withdrew it.

Appellee's next visit with Juliet was in March. It lasted for a weekend, and evidently was without incident. After appellee entered the Navy on May 7, 1976, she did not see or communicate with Juliet for several months. Their next visits were on October 9–10 and December 10–12, 1976. These visits also were without incident, except that a dispute arose concerning appellee's request to visit Juliet at Christmastime. On December 12 appellant told appellee that she would not be permitted to visit Juliet at Christmastime. He withdrew the permission he had previously given, which understandably upset appellee, for she had already taken military leave to visit Juliet at Christmastime and had made arrangements with her family in connection with the visit. Appellee therefore again retained counsel, and eventually appellant agreed to permit a visit on December 27, two days before appellee had to report back to her station. Appellee, however, did not learn of appellant's concession until January, and the visit did not occur.

Appellee's next visit with Juliet was a weekend in January 1977, and further visits occurred in March and May. These visits, it appears, were without incident, except that appellant informed appellee that she could no longer come inside when she arrived at his house to take Juliet, but had to wait at the door. It also appears that during the first part of 1977, in the winter, appellant failed to keep appellee informed of Juliet's health and progress in school, and appellee received but one card from Juliet. The parties' next visitation dispute concerned Juliet's presence at appellee's wedding to her present husband in June 1977. Appellee wanted Juliet to be a flower girl in the wedding. Appellant initially refused to allow Juliet to attend the wedding, giving as his reason that she would miss her kindergarten classes. This reason was obviously specious, for the superintendent of schools informed appellee that it would be educa-

tional for Juliet to attend the wedding, which was to take place at West Point, New York. Nevertheless, appellant's intransigence, which by this time included a refusal to allow appellee to speak with Juliet on the telephone,[4] necessitated appellant's retention of legal counsel once again, and once again, after appellee retained counsel, appellant suggested that appellee should take Juliet back permanently, and then upon further reflection withdrew the suggestion. Eventually, the parties stipulated to the entry of a visitation order dated May 26, 1977, giving appellee custody of Juliet from June 4–9, 1977 (to permit Juliet's attendance at appellee's wedding), for two additional weeks in the summer of 1977, for one month in the summer of 1978, for ten days during the 1977 Christmas holiday, and for other periods "as may be agreed upon by mutual consent, which consent shall not be unreasonably withheld." When this stipulation was made, appellant knew that in the summer of 1978 appellee and her new husband would be living in the Panama Canal Zone, where appellee's husband would be stationed, and that Juliet would be visiting them there.

The summer visits and Christmas visit in 1977 occurred without further legal dispute between the parties. There was evidence, however, that appellant neglected to prepare Juliet emotionally for her Christmas visit with appellee, and that as a result, Juliet initially did not want to go, although when she did go, she had a good time.

From January to April 1978, appellee and her new husband, Les, were in Georgia, where Les was undergoing military training. During this period appellee did not visit Juliet, nor Juliet her, but appellee wrote to Juliet twice a month. Appellee, however, received no communications from Juliet. Moreover, it appears that Juliet did not receive

4. Appellee testified that during an eleven day period in May she telephoned Juliet at least twelve times but was always told that Juliet was not at home or was not available to speak with her. Although appellee could offer no direct proof that in telling him this, appellant and Susan were fabricating, the evidence leads to a strong suspicion that on at least some of these occasions Juliet in fact was available. In any event, the evidence unequivocally shows that appellant and Susan did not help appellee in her efforts to speak with Juliet.

at least one letter from appellee in which appellee tried to prepare Juliet for her impending summer visit to the Panama Canal Zone. In April 1978, after appellee and Les moved to the Canal Zone, appellee received a letter from appellant's attorney stating that appellant after all would not send Juliet to Panama, unless he received financial assurance that appellee would return Juliet at the end of the prescribed visitation period. The letter also cited appellant's "personal misgivings with regard to the length of the visitation" and his belief "that two weeks would be sufficiently long." Appellee promptly consulted a military attorney, and following communications between counsel, appellee was informed that appellant would allow Juliet to visit Panama as set forth in the visitation order of May 1976. However, by this time appellee's patience was exhausted, and on July 19, 1978, she initiated the custody litigation now before us by filing a petition for Juliet's custody, alleging as cause appellant's repeated interference with her visitation rights.

Appellant opposed the petition, and hearings were held on August 10 and 11, 1978, and September 29, 1978. While this litigation was going on, appellant again decided to oppose appellee's summer visit with Juliet, and court intervention was again necessary to protect appellee's visitation rights. Juliet stayed with appellee and Les from August 1 to August 30, first in the District of Columbia and later in the Canal Zone. After appellee returned Juliet to appellant, on August 30, appellee asked appellant for permission to visit Juliet on a weekend prior to the final court hearing. Appellant refused this request, even though he knew, or had reason to know, that after the hearing appellee would be leaving for the Canal Zone.

On November 3, 1978, the lower court entered an order and opinion granting appellee's petition and giving her immediate custody of Juliet. On November 8, 1978, appellant filed this appeal, and on November 22, 1978, this court, per former President Judge JACOBS, granted appellant's application for a stay of the lower court's order pending disposi-

tion of the appeal. As a result, Juliet has remained in appellant's custody.[5]

## —ADEQUACY OF THE LOWER COURT'S OPINION—

In its opinion, the lower court discussed at some length appellee's fitness to have custody of Juliet. Without question, the record does demonstrate that appellee is fit. Indeed, there was no real contention to the contrary. Although appellant complained of appellee's care of Juliet during their marriage, the validity of his complaints was undermined during cross-examination and by Susan's testimony that she trusted appellee's abilities as a parent.[6] Moreover, although appellee experienced economic difficulty immediately after her separation from appellant, she has since demonstrated by her stint in the Navy both her desire and ability to develop marketable skills; while in the Navy, she received several honors, including one for being the best recruit in her training group.

The lower court was also impressed, as well it might have been, with appellee's husband, Les. Les graduated from West Point as a commissioned officer in the United States Army, with honors too numerous to list here. He has demonstrated musical abilities, and has long been active in church functions. The record leaves no doubt that Juliet's interests would be served if custody were awarded to appellee. Not only would her economic and educational needs be served through Les's position as an officer at a well-established overseas military facility, but also, appellee, who is now a housewife, would have the opportunity to provide Juliet with a rewarding home life.

5. The record of this case was not lodged in this court until October 23, 1979. We do not know the reason for this long, and most unfortunate, delay.

 We note that the record indicates that Juliet visited appellee in Panama this past summer from July 10 to August 5, 1979.

6. Susan lived next door to the parties while they were married and was able to observe appellee's care of Juliet at that time. Susan had also occasionally employed appellee as a babysitter for Ryan.

The lower court was satisfied, and we agree, that in all likelihood, Juliet would have all the amenities a little girl could hope for if she lived with appellee. She is appellee's only child, and because appellee had a tubal ligation performed in 1975, it is unlikely that appellee will have another child. Les has shown a marked interest in Juliet, and Juliet is fond of him. Moreover, although the affection appellee and Les have for Juliet is great there is little reason to fear that they would become so possessive as to interfere with Juliet's natural affection for appellant. Appellee and Les both testified that they would encourage Juliet to maintain her present relationship with appellant and his family, and the lower court found this testimony credible.

Given, however, Juliet's long residence in appellant's household,[7] it was not enough for the lower court to assure itself of appellee's and Les's fitness to have Juliet with them. The court was further required to consider the advantages and risks of a change in custody. This court has noted the importance to a child's development of a stable relationship with an established parental figure and a known physical environment. *Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979); *Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Sweeney v. Sweeney*, 241 Pa.Super. 235, 361 A.2d 302 (1976); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). "There can be no question that stability is important to a child's welfare, and that in deciding who should have custody of the child it will therefore always be essential to consider how long the child has spent with [the parties]." *In re Hernandez*, 249 Pa.Super. 274, 296–297, 376 A.2d 648, 660 (1977). A child above the age of two may become strongly attached to those who stand in a parental relationship and who has tenderly cared for her, *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 89, 369 A.2d 821, 824 (1977), so that to break the bonds of affection " 'may result not only in the child's

7. At the time the lower court entered its order in November 1978, Juliet had been living with appellant for more than three years. By the time this opinion is rendered, she will have lived with appellant for more than four and a half years.

unhappiness, but also in its physical injury.' " *Commonwealth ex rel. Kraus v. Kraus*, 185 Pa.Super. 167, 175, 138 A.2d 225, 229 (1958), *quoting Commonwealth ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 66 A.2d 300 (1949). Because of the child's need for stability in the early years, it is frequently wise to delay a change of custody until the child is older. *McCourt v. Meyers*, 268 Pa.Super. 152, 407 A.2d 875 (1979).

■ Of course, "[t]he fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody." *Hooks v. Ellerbe*, 257 Pa.Super. 219, 225, 390 A.2d 791, 794 (1978). Nevertheless, where the child's parents are equally fit, or nearly so, as in the present case, the fact that a stable, long–continued and happy relationship has developed between the child and one of the parents may be of critical importance to the formulation of an appropriate custody decree. Furthermore, the importance of such a relationship is augmented in the present case by Juliet's close friendship with Ryan, who, though not Juliet's natural brother, is as like a brother as Juliet will probably ever have. *See, e. g., Commonwealth ex rel. Steuer v. Steuer*, 244 Pa.Super. 302, 368 A.2d 732 (1976); *In re Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976); *In re Russo*, 237 Pa.Super. 80, 346 A.2d 355 (1975) (as general rule public policy favors keeping siblings in same household whenever possible).

■ We believe the lower court did not give adequate consideration to these factors. The court failed to discuss in its opinion the possible effect Juliet's removal from appellant's household might have upon her except to say, "Nor does the immediate moving of Juliet out of [appellant's] household disrupt a 'well adjusted' child by uprooting her against 'her will' to a new or undesired environment,' with 'no valid reason' given. . . ." Slip op. at 12. We cannot tell from this statement upon what evidence the court based its conclusion that a change of custody would not disrupt Juliet's life, and we cannot find such evidence in the record. The lower court also dismissed the uncontradicted evidence of Juliet's close relationship with Ryan by

stating that Juliet could not benefit from Ryan because he was younger than she. We find this conclusion insupportable either as a theory of child development or as a conclusion of law. *See, e. g., Commonwealth ex rel. Kraus v. Kraus, supra* (held, that it was to older child's advantage to be raised with younger siblings). What seems to have impressed the lower court as much as anything else was Juliet's outward resemblance to appellee. Thus, the court emphasized that Juliet "manifested attributes of her Mother [] in 'acting out' by expressions and gestures," and in her "display of grace, precocity, of 'acting out her feelings,' of demonstrably releasing her artistic talents." On this basis, the court concluded that "[o]nly [appellee] can offer Juliet the most of guidance, support, and encouragement whereby she can blossom in her individual development." Slip op. at 7, 10. This conclusion does not follow logically from its premise: That a child may outwardly resemble one parent more than another does not mean that that parent is better qualified to have custody of the child. That a child may inherit grace and artistic talent from one parent does not mean that that parent will foster the development of those qualities more ably than the other parent will. The scope of our review in a child custody case is very broad, *Commonwealth ex rel. Holschuh v. Holland–Moritz,* 448 Pa. 437, 292 A.2d 380 (1972), and although we shall not nullify the fact–finding function of the hearing judge, we are not bound by deductions or inferences made by the hearing judge from the facts as found. *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974). Furthermore, we shall not accept a finding that has no competent evidence to support it. *Tomlinson v. Tomlinson, supra.*

## —DISPOSITION ON THE MERITS—

Sometimes where the lower court's opinion seemed to us inadequate, we have held that the case should be remanded for further proceedings. *See Valentino v. Valentino,* 259 Pa.Super. 395, 393 A.2d 885 (1978); *Commonwealth ex rel.*

*Cox v. Cox,* 255 Pa.Super. 508, 388 A.2d 1082 (1978) (hearing judge in child custody case has responsibility of ensuring complete record and filing comprehensive opinion). However, having engaged in a comprehensive review of the record, as is our duty, *Lewis v. Lewis,* 267 Pa.Super. 235, 406 A.2d 781 (1979); *Scarlett v. Scarlett,* 257 Pa.Super. 468, 390 A.2d 1331 (1978), we find that the essential facts are undisputed and the record otherwise sufficiently complete to enable us to determine where the merits of the appeal lie. *Compare Haraschak v. Haraschak, supra; Hooks v. Ellerbe, supra; Sweeney v. Sweeney, supra* (cases in which this court reached the merits despite procedural defects). Furthermore, it is settled that having determined the merits of the appeal, this court is empowered to enter an order as justice requires. *In re Hernandez, supra.*[8]

As we perceive this case, the decisive issue is whether appellant's deliberate obstruction of appellee's right to visit Juliet so outweighs the benefits that would result to Juliet from continuing her residence in appellant's household that a change in custody is required.

Before we may address this issue, we must consider appellant's contention that a custodial parent's obstruc-

8. Because we find the record sufficiently completed to reach the merits, it is unnecessary to address appellant's contentions that the lower court erroneously relied on the tender age presumption, and that it applied improper criteria to determine the credibility of the witnesses. It is also unnecessary to decide whether the admission of answers to written interrogatories of character witnesses who were absent at the hearings constituted reversible error, for the admission of those answers does not affect our disposition. Similarly, the lower court's clear error in interviewing Juliet off the record and then relying on her responses made during the interviews, *see Commonwealth ex rel. Scott v. Rider,* 248 Pa.Super. 383, 375 A.2d 149 (1977); *Commonwealth ex rel. Lee v. Lee,* 248 Pa.Super. 155, 374 A.2d 1365 (1977), becomes unimportant in light of our disposition. It is to be noted, however, that the lower court did conduct one on–the–record interview with Juliet in the presence of counsel and that during the interview Juliet stated that she preferred to live with appellant. Given Juliet's age, her long residence in appellant's household, and appellant's attempts to hinder appellee's efforts to become dear in Juliet's affections, we accord Juliet's stated preference very little weight–so little, indeed, that it is fair to say that our disposition has not been affected by Juliet's stated preference.

tion of the non–custodial parent's right to visit the child may not, as a matter of law, serve as the basis of an order changing custody; appellant would treat the "right to custody" and the "right to visit" as rights to be defined without reference to each other. We find no merit in this contention. It has been rejected by courts in other states, *e. g., Muraskin v. Muraskin*, N.D., 283 N.W.2d 140 (1979); *Entwistle v. Entwistle*, 61 A.D.2d 380, 402 N.Y.S.2d 213 (1978); *Brittain v. Brittain*, 4 Fam.L.Rep. 2046 (N.C.Ct.App., filed Oct. 19, 1977), and nothing suggests that the law in this Commonwealth is different. It has long been against our public policy to limit or destroy the relationship between parent and child, *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977); *Commonwealth ex rel. Turner v. Strange*, 179 Pa.Super. 83, 115 A.2d 885 (1955); *Commonwealth ex rel. Manning v. Manning*, 89 Pa.Super. 301 (1926), and except in unusual circumstances the estrangement of a child from either parent will not be sanctioned, *Fernald v. Fernald*, 224 Pa.Super. 93, 302 A.2d 470 (1973); *Leonard v. Leonard*, 173 Pa.Super. 424, 98 A.2d 638 (1953); *Commonwealth ex rel. Timmons v. Timmons*, 161 Pa.Super. 174, 54 A.2d 75 (1947). *See also In re Strapple*, 263 Pa.Super. 187, 397 A.2d 809 (1979); *Scarlett v. Scarlett, supra; Commonwealth ex rel. Peterson v. Hayes*, 252 Pa.Super. 487, 381 A.2d 1311 (1977). Furthermore, this court has in the past carefully guarded the right of a non–custodial parent to visit the child, "for when parents are separated and custody is placed in one of the parents, there exists a danger that the parent having custody of the child may use his or her advantageous position to alienate the other parent from the affections of the child." *Commonwealth ex rel. Lotz v. Lotz*, 188 Pa.Super. 241, 246, 146 A.2d 362, 364 (1958), *aff'd*, 396 Pa. 287, 152 A.2d 663 (1959). *See also Commonwealth ex rel. Sorace v. Sorace*, 236 Pa.Super. 42, 44, 344 A.2d 553, 554 (1975). Every parent has the right to develop a good relationship with the child, and every child has the right to develop a good relationship with both parents. *See generally Commonwealth ex rel. Ermel v. Ermel*, 259 Pa.Super. 219, 393 A.2d 796 (1978). When a custodial parent so obstructs the visits between the

child and the non–custodial parent that the best interests of the child are no longer being served, a change of custody is warranted. Moreover, an obstruction of the right to visit the child is especially serious where, as in the present case, a court visitation order has been entered. A custodial parent who wilfully ignores a visitation order and obstructs the child's visits with the non–custodial parent is little different from the parent who ignores a court order awarding custody and by force or trick snatches the child from the other parent. In both instances, extra–legal means are used to defeat the other parent's established legal rights. Such conduct will not be tolerated by this court. *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *Reed v. High*, 254 Pa.Super. 367, 370, 385 A.2d 1384, 1385 (1978) (SPAETH, J., concurring); *In re Myers, supra*, 242 Pa.Super. at 231, 363 A.2d at 1245 (SPAETH, J., concurring); *Commonwealth ex rel. Blank v. Rutledge*, 234 Pa.Super. 339, 347, 339 A.2d 71, 77 (1975) (SPAETH, J., concurring and dissenting); Uniform Child Custody Jurisdiction Act, 11 P.S. § 2309 (1979–80 Supp.); Commonwealth Child Custody Jurisdiction Act, 11 P.S. § 2409 (1979–80 Supp.).

 Returning, then, to what we have described as the decisive issue in this case: After consideration of the entire record, we have concluded that appellant's deliberate obstruction of appellee's right to visit Juliet has not been of sufficient magnitude to justify the removal of Juliet from his household at this time. In particular, appellant has not attempted to prevent all visits between appellee and Juliet; rather, of the twelve visits that have occurred from October 1975 through August 1978, appellant tried to prevent four from occurring. Two of these four involved visits during the 1975 and 1976 Christmas holidays; another involved appellee's wedding; and the last involved Juliet's visit to the Panama Canal Zone in 1978. Appellant's obstruction of the Christmas visits may have been motivated more from a desire to keep Juliet with him at a festive time of the year than from a desire to keep her from appellee. Appellant's hesitation to send Juliet to Panama in 1978 without financial

assurance from appellee that Juliet would be returned at the end of the visitation period finds some support in our cases, *see Commonwealth ex rel. Logan v. Toomey*, 241 Pa.Super. 80, 359 A.2d 468 (1976); *Nunez v. Nunez*, 220 Pa.Super. 77, 283 A.2d 730 (1971), although it must be added, that given appellee's character, station in life, and perfect record of returning Juliet to appellant after visits, as well as the visitation order of May 1977, which did not require financial assurance from appellee, appellant's hesitation was unreasonable. Appellant's reluctance to permit Juliet to attend appellee's wedding seems to us contemptible but may perhaps be explained as an emotional response to appellee's remarriage. Also, we note that appellant has not violated the *letter* of the May 1977 visitation order, unless we construe appellant's initial refusal to send Juliet to Panama in 1978 without financial assurance as an anticipatory breach.

In thus commenting upon the particular circumstances in which appellant's obstruction of appellee's right to visit Juliet occurred, we do not intend to justify appellant's conduct, but rather only wish to show that mitigating circumstances may have existed that lessen the culpability of his wrongdoing. This is not to say that appellant was not culpable, and he would be foolish indeed to believe that by virtue of our reversal today of the lower court's order he may safely repeat his past actions. Those actions have jeopardized his right to have custody of Juliet and have transformed what would have otherwise been a relatively clear case into a close and difficult one.

Although we have thus concluded that we should not order a change of Juliet's custody from appellant to appellee, we remain disturbed by appellant's apparent inability, or unwillingness, to recognize that it is of the highest importance that a strong and happy relationship should develop between Juliet and appellee. Appellant's attitude may be illustrated by some examples from the record.

One example is appellant's explanation at the hearings below of his refusal to allow certain visits:

> There have been a couple of incidents where requested dates have been turned down by us due to the fact that something else had already been planned well enough in advance that we couldn't change it or we couldn't make any amendments to what are [*sic*] plans were. There were other times that requests were made and we would say, "Well, tentatively yes," and come to find out that was the particular time that there was something else of importance that I did not think of when I said it.

Record at 178a.

Given appellee's infrequent opportunities to visit Juliet, this statement can only be characterized as selfish.

Another example is appellant's refusal to allow appellee a weekend visit just prior to the final hearing in the court below. Appellant knew, or had reason to know, that appellee would be leaving this country after the final hearing, and, therefore, whatever the court's decision should prove to be, would not see Juliet again for a long time. We do not expect a parent under the stress of the custody proceedings to act dispassionately. Even so, appellant's conduct on this occasion was similar to, and reminiscent of, his conduct in the spring of 1977, when he resisted Juliet's attendance at appellee's wedding, and in the spring of 1978, when he wrote (through counsel) to appellee (after she had left the country following a four month stay in Georgia) that he would not send Juliet to Panama.

In view of this evidence of appellant's attitude, we have concluded that legal measures need to be imposed to guarantee, as best we can, that Juliet and appellee will have adequate opportunity to be with each other and to develop a strong and happy relationship. We have further concluded that the evidence amply shows that Juliet's best interests will be served by visitation arrangements that will give Juliet the greatest possible amount of time with appellee, consistent with the preservation of her present relationship with appellant and the other members of his family. To accomplish this purpose we now enter the following order.

The order of the lower court is reversed and custody of Juliet is awarded appellant, subject, however, to the following provisions.

1. So long as appellee resides outside the continental United States because of her or her husband's employment in the armed services, Juliet shall visit appellee (a) during Juliet's summer vacations, beginning the eleventh day after the end of her spring school term and ending the eleventh day before the commencement of her fall school term and (b) during a period that appellee temporarily returns to the continental United States, provided that appellee has given appellant two weeks notice of her desire to have Juliet visit her, and provided further that the visit will not interfere with Juliet's school attendance.

2. Appellee shall not be required to post bond to guarantee Juliet's return to appellant following any visit, unless appellant, upon petition to the lower court, proves a change in circumstances occurring after the entry of this opinion and order making the posting of bond reasonable.

3. All transportation expenses incurred incident to Juliet's visits with appellee shall be borne by appellee, unless appellee proves to the lower court's satisfaction that she is unable to bear the expense. Upon such proof appellee and appellant shall bear Juliet's transportation expenses as the lower court may order.

4. Appellant shall ensure that Juliet writes appellee at least once a month during Juliet's school year and keeps appellee accurately informed as to her health, progress in school, and important events in her life. If Juliet does not write her monthly letter, for whatever reason, appellant himself shall write appellee and convey the above information and also explain why Juliet has not written. Appellant shall deliver to Juliet all mail and gifts sent to her by appellee. Appellant shall permit appellee to speak with Juliet on the telephone. Appellant shall not act in any way whatsoever so as to alienate Juliet's affections for appellee.

5. During Juliet's summer vacation visits with appellee, appellee shall ensure that Juliet writes appellant at least once every two weeks, and keep appellant informed as to her health and her vacation experiences.

6. Nothing in this order shall preclude such future proceedings in the lower court or another court having jurisdiction of the parties as Juliet's best interests may require.

VAN der VOORT, J., files a dissenting statement.

VAN der VOORT, Judge, dissenting:

The majority of our Panel reverses the Order of the court below which after a hearing had awarded custody of a nine year old girl to the mother. During the approximately three years when the father had custody of his daughter, he deliberately discouraged and sometimes thwarted the visitation of the child with her natural mother. I cannot bring myself to accept the holding by the majority that it is in the best interest of the child to be placed in the custody of one parent who obstructs the visitation by the child with the other parent.

I would affirm the Order of the court below placing custody with the natural mother; hence I respectfully dissent.