**Carbo v. Carbo**

C.P. of Berks County, no. 06-04448 # 3.

*Anthony Carbo,* pro se.
*Rebecca Bell,* for appellee.

KELLER, *J.,* November 18, 2008—The plaintiff/ appellant in the above captioned case appeals this court's order of September 15, 2008 whereby this court, after a "best interests of the child" analysis, ordered no change to the parties' current custody order, allowing Mother to retain primary physical custody and awarding Father partial physical custody of the minor children. The current appeal was filed by appellant pro se on September 19, 2008 and then amended on October 2, 2008.

On October 15, 2008, this court issued an order pursuant to Pa.R.A.P. 1925(b) directing the appellant in the above captioned case to file of record and serve upon this court a concise statement of errors complained of on appeal no later than 21 days after the date of that order. The concise statement was filed on October 27, 2008 and raises the following issues on appeal:

"(1) Plaintiff, Anthony F. Carbo, appellant, has identified the errors in as much specificity as possible.

"(2) The court erred when on July 8, 2008, at the custody conference and scheduling custody trial de novo, James Markofski represent Dawn L. Carbo, B.R.C.P. Rule 1915.3(e) NO attorney shall be permitted to represent a party in custody proceedings unless a written appearance of that attorney is first filed of record.

"(3) The court erred when on July 8, 2008 the court denied appointment of guardiam (sic) ad litem. All three children asked for an attorney.

"(4) The court erred when State Trooper Dziedzic did not bring all that was asked by the subpoena, His report form April, 12, 2006.

"(5) The court erred, when the subpeona for Jeannette Bolich to testify was noy (sic) honared (sic).

"(6) The court erred by granting continued (sic) after continued (sic) to the defendant's counsel.

"(7) The court erred when a hearing judge interviews a child in a custody case, certain procedures must be generally met:

"(1) counsel must be present: was denied

"(2) counsel must have the opportunity to question the child: was denied

4

"(3) the testimony must be transcribed and made a part of the record:

"The Superior Court has prescribed this procedure for the interrogation of a child who is the subject of a custody action, In *Gerald G. v. Theresa G.,* 284 Pa. Super. 498, 426 A.2d 157 (1981) the court has states this certain procedur (sic)

"(8) I Anthony F. Carbo object to the children being driven to court by the stepsister Jessica Carbo, who had an hour of alone time with the children befor (sic) they were in court to testify.

"(9) The court erred when it stoped (sic) me from hearing testimony on Mrs. Nancy Alman and Hunter Myu.

"(10) The court erred when I was not able to give testimony on attorny (sic) John A. Hoffert, Esq. When on July 14, 2006 Mr. Hofffert told me that it was the law in Berks County, that I had to give primary physical custody to Dawn L. Carbo first and go to a marriag (sic) councilor (sic) and then I had to redo the custody of children. I haved (sic) been fighting for my children every day after that."

## PROCEDURAL HISTORY

This case, like so many custody disputes, weaves a tangled web which only serves to ensnare the three small children who find themselves the subject of their parents' tireless battle. The saga began on May 11, 2006 when Father filed a divorce complaint, including a custody count, by and through his then attorney, Daniel Sager, Esquire. The parties were scheduled to attend a custody

conciliation on July 3, 2006 as well as attend the "Children in the Middle" program, which both parties did. Subsequently, this court entered an order on July 14, 2006 upon agreement of the parties and after the above named custody conference with Robert E. Giering, Esquire. The parties agreed that Mother and Father would have joint legal custody of the three children, Mackenzie, Madelyn, and Cassidy, with Mother having primary physical custody and Father having partial physical custody on alternate weekends from Friday at 3 p.m. until Sunday at 6 p.m., and every Monday and Wednesday from 3 p.m. until 7 p.m. The parties further agreed to alternate holidays, and share custody at other non-scheduled times as they agreed. Further each parent was to have one week of vacation in the summer, providing 30 days notice to the other parent, with Mother's choice of a week taking priority in even numbered years and Father's choice taking priority in odd numbered years. On January 18, 2007 Attorney John A. Hoffert, Esquire withdrew his appearance on behalf of Father and Attorney Daniel Sager, Esquire entered his in place of Attorney Hoffert's. Soon thereafter on August 20, 2007 Attorney Sager motioned this court to withdraw his appearance on behalf of Father as he didn't believe he could represent Father any longer because of differences of opinion with respect to the representation. This court issued a rule to show cause on August 21, 2007 and then granted the motion on August 29, 2007. Thereafter, Father entered his appearance on behalf of himself.

A ceasefire appeared to have been reached between the parties, and all was quiet on the home front until April 21, 2008 when Father filed a petition to modify the custody order. In that petition Father indicated that he and

the children wanted to spend more time with one another. A custody conciliation was scheduled for June 4, 2008. Father then requested this court allow him to proceed in forma pauperis; that request was granted. He then filed a petition for contempt of order of custody on May 14, 2008 alleging that he had not been informed until the day before the surgery that his daughter Madelyn was scheduled to have tubes put in her ears and also that he was not informed until the night before that his daughter Cassidy was having an infected tooth removed. He further alleged he had not seen Mackenzie or Madelyn's report cards for the past two years and also that he had experienced trouble contacting his children through Wife's cell phone. Father also prayed this court grant him counsel fees as he had incurred a "substantial" amount, a somewhat questionable request for a pro se litigant. On May 28, 2008 this court scheduled an evidentiary hearing for July 1, 2008. Then, on June 9, 2008 the custody master filed his recommendation. This court then scheduled the case for a pretrial conference. Before the scheduled hearing, Father filed exceptions to the recommendation of the custody master on June 16, 2008. He indicated that the master erred by not awarding him primary physical custody and by giving him alternate weekends and two days during the week, that the master erred by alternating holidays as Mother's religion did not permit celebration of holidays, that the master erred by not allowing Father to "speak on the unequivocal behaver (sic) of John A. Hoffert, Esquire," that the master erred by not "separating his proficiency and personal relationship with John A. Hoffert," making "wrongful recommendations for punishment to Father so he cannot see or spend time or be a positive roll (sic) motal (sic)

in the children's life that the children want," that the master erred because the petition was for Father to have more time with his children and the master instead took time away, and that the master erred by "not concerning the contempt custody order in Judeg (sic) Keller court on July 8, 2008." On that same day Father also petitioned this court to appoint an attorney for the children, a request which this court deferred until hearing. This court then subsequently denied that request as well as Father's petition for contempt of the custody order. A custody trial de novo was scheduled until August 27, 2008. Surprisingly, Father then petitioned this court to disqualify Mother's counsel, Rebecca Bell, Esquire. This court set a hearing in the matter for August 12, 2008. Mother's counsel then petitioned this court for a continuance. This court granted the continuance and rescheduled the case for August 27, 2008. The case was then further continued until September 10, 2008 at the request of Mother's counsel. After hearing held, this court issued the order of September 15, 2008, an order similar to the original order but granting Father more time in that he would have custody of the children from Friday at 3 p.m. until Monday, and if the children had off of school on Monday, until Monday at 3 p.m. He was also given Tuesdays from 3 p.m. until 8 p.m. Father would also have the Christmas holiday, and Mother would have the Thanksgiving holiday. It is this order that Father now appeals to the Superior Court of Pennsylvania.

## DISCUSSION

In cases involving child custody the court is obligated to look at the "best interests of the child" in making its determination. The "best interests of the child standard"

is applied on a case-by-case basis and includes a consideration of all factors "which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *In re Slaughter,* 738 A.2d 1013, 1015, (Pa. Super. 1999) (citing *Sawko v. Sawko,* 425 Pa. Super. 450, 454, 625 A.2d 692, 693 (1993)).

Father first argues that James Markofski, Esquire, who represented Mother at the custody conference, did not enter his appearance on the record. However, this of no consequence to the matter at hand as it occurred at the *custody conference* between the parties. This court heard the case in a hearing de novo and it is the order from *that* trial that Father is appealing, *NOT* the recommended order of the custody officer. Therefore, as the incident did not occur at the hearing de novo this court need not further address the merits of the issue.

Father next argues that this court denied appointment of a guardian ad litem for the parties three children even though the children requested an attorney. In *C.W. v. K.A.W.,* 774 A.2d 745, 748 n.3 (Pa. Super. 2001), the Superior Court made a poignant observation about the role of the guardian ad litem saying:

"[w]e note that a guardian ad litem is not normally appointed in custody cases involving natural parents. A guardian ad litem is a person appointed by the court to represent a minor child's interest in particular litigation before the court. The appointment of a guardian ad litem is generally reserved for those actions where the trial court deems it necessary because the child's interest may be adversely affected, *e.g.,* adoptions. However, in custody cases involving natural parents, despite the bitterness of each party towards each other, both parties are

focused on the best interests of the child. See *e.g., Moorman v. Tingle,* 320 Pa. Super. 348, 358, 467 A.2d 359, 364 (1983). Moreover, in a custody case, the trial court is obliged to ascertain the child's best interest. See *McMillen v. McMillen,* 529 Pa. 198, 202, 602 A.2d 845, 847 (1992). Since both parties and the trial court are focused on the child's best interests, it appears that the appointment of a guardian ad litem would not be proper absent extraordinary circumstances, and we note that bitterness between the parties ordinarily does not rise to the level of extraordinary circumstances needed for an appointment of a guardian ad litem."

As the Superior Court so eloquently put, a guardian ad litem is only necessitated when the child's interests may be adversely affected by the litigation. Here, as is usually the case when parents are vying for physical custody of their children, everyone has the child's best interests at heart, not only the parents, but also the court. In the instant case, as this court has long been familiar with the parties, not only through this action but also through the parties' divorce action, this court did not believe that appointment of a guardian ad litem for the three minor children was warranted. Extraordinary circumstances simply do not exist. This court further had the opportunity to speak with the three young ladies who find themselves the prize of their parents' litigious and bitter divorce in chambers, and even in the confines of that environment, none of the children expressed any indication nor exhibited any behavior that might oblige this court to appoint a guardian. Here, it is clear that the children and the parents share the same goal namely, proceeding forward in a way that allows the children to spend the most time with each parent while still retaining

some sense of stability and normalcy in their young lives.

Father next argues that this court erred when State Trooper Dziedzic did not bring all documents requested in Father's subpoena. However, Father failed to follow the proper procedure in obtaining the documents. In fact, the trooper testified on the record why he did not bring the documents. The testimony was as follows:

"Trooper: Corporal Reichert is my immediate supervisor. He advised me that the procedure to obtain our report was not followed through correctly and, therefore, I was not to bring any material here other than my recollection.

"The Court: Well, as a practical matter, you didn't actually observe anything other than talking with Mr. Carbo and

"Trooper: I believe Mr. Carbo's comment one was about a complaint. Now, to me, that would be a criminal complaint, and I can be 100 percent certain that I did not file any criminal charges against anybody regarding any matter that occurred on April 12. The only thing I would do is an assignment report, names and their statements and so forth. So the report itself is only going to basically state that. Children services I may have contacted them. I am not 100 percent certain.

"The Court: All right.

"Mr. Carbo: I would think that, your honor, that I did and I did talk to the corporal because our dates here have been postponed constantly, and I did talk to the corporal, and he told me—

"Ms. Bell: Objection.

"Mr. Carbo:—What to do.

"Ms. Bell: Objection.

"The Court: Well, it is really not relevant, Mr. Carbo. The report isn't really relevant. I have allowed you great leeway to have the trooper testify, much of which was hearsay. I don't know the relevance of this, but you can testify yourself about these things. A report isn't going to help you. It doesn't further the inquiry anywhere and . . . ." (N.T., custody trial, 9/10/08, at 9-10.)

The record indicates that Father served subpoenas on Trooper Dziedzic as well on the commissioner as the custodian of records. While he did this in compliance with proper state police procedure, he failed to follow Pennsylvania Rules of Civil Procedure 4009.1, 4009.21-4009.27. However, even if Father had followed proper procedure, the records that Father tried to subpoena were not relevant to the issue of child custody, as this court noted in the aforementioned notes of testimony, thus failing to be admissible under Pennsylvania Rules of Evidence 401-402.

Father also argues that this court erred when "the subpoena for Jeannette Bolich to testify was noy (sic) honared (sic)." (Plaintiff's concise statement at 1.) The relevant testimony regarding Ms. Bolich is as follows:

"The Court: What would she testify to?

"Mr. Carbo: It goes I had Ms. Bolich here so that I can go over in my petition on the religion, and it is a big factor, the difference of religion between Ms. Carbo and I, and Ms. Bolich is actually Jeannette Bolich is actually an authority. I would consider he an authority on the Jehovah Witness religion, and she can testify to the way

that Dawn Carbo was raised and her beliefs and the way that she follows that religion, and it goes to the very heart of this case, your honor. It goes to the very heart of this case, and I believe that the court needs to hear her testimony.

"The Court: Well, you can question Ms. Carbo about those things, and if she presents testimony that you think Ms. Jeannette Bolich would contradict, then we might be in a position to require her to be here to testify, but I don't know that we need to have her without actually asking Ms. Carbo these questions first." (N.T., custody trial, 9/10/08, at 4-5.)

As indicated in the testimony above, Ms. Bolich's testimony was not necessary to the resolution of the issue of Mother's religion, as indeed Mother could and *did* testify to the issue herself. Further, Father did not call Ms. Bolich as a rebuttal witness, nor did he testify to the issue in his own rebuttal of Mother's testimony. This court had no reason to hear Ms. Bolich on the matter thereafter as her testimony was not relevant, nor essential.

Father next alleges that this court erred when it granted "continued after continued to the defendant's counsel." We assume that Father intended to say continuance after continuance and will address the issue as such. A review of the record indicates that Mother's attorney filed two written requests for a continuance. The first motion for continuance was filed on August 4, 2008, and was filed in response to Father's motion to disqualify Mother's counsel. In counsel's motion she requested the hearing be continued because she was already scheduled to appear before the Court of Common Pleas of Montgom-

ery County in a protection from abuse matter. Pa.R.C.P. 216 sets forth the grounds for a continuance and states specifically under (A)(4) that a continuance may be granted for "[s]uch special ground as may be allowed in the *discretion* of the court." (emphasis added) Further, in *Baysmore v. Brownstein,* 771 A.2d 54, 57 (Pa. Super. 2001), the Superior Court stated, "the trial court is vested with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent. *Walasavage v. Marinelli,* 334 Pa. Super. 396, 413, 483 A.2d 509, 518 (1984). An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias or ill will. *Commonwealth v. Smith,* 543 Pa. 566, 571, 673 A.2d 893, 895 (1996)." Here, no such circumstances existed. This court found counsel's reason warranted a continuance of the matter and used its discretion to reschedule, as this court set the hearing date without input from counsel. Moreover, this court did not act antagonistically in granting this continuance so as to warrant an abuse of discretion.

Counsel's second continuance was filed on August 12, 2008. This court scheduled the parties' custody hearing and Father's hearing on his motion to disqualify Mother's counsel for August 27, 2008. On this date, and in fact from August 18—August 28, 2008 counsel had a planned vacation to St. Martin which could not be rescheduled. Again, in its sound discretion, this court found a continuance was warranted and thereafter rescheduled the matter to Sep-

tember 10, 2008, when it was heard by this court. This court did not abuse its discretion by granting said continuance. Neither this court nor counsel displayed any vexatious conduct towards Father in requesting and granting these two continuances, but instead this court sought to hear the matter at a time when no party was otherwise engaged. It should further be noted that the aforesaid continuances in no way prejudiced Father or his case as in total both continuances only extended hearing of the matter from August 12, 2008 until September 10, 2008.

Father next raises the issue that this court erred when it interviewed the parties' three young children in chambers in the absence of counsel. This court is quite familiar with the general rule prescribed by Pa.R.C.P. 1915.11(b) which states, "[t]he court may interrogate a child, whether or not the subject of the action, in open court or in chambers. The interrogation shall be conducted in the presence of the attorneys and, if permitted by the court, the parties. The attorneys shall have the right to interrogate the child under the supervision of the court. The interrogation shall be part of the record." This court is further aware of the Superior Court's most recent case dealing with this issue, *Ottolini v. Barrett,* 954 A.2d 610 (Pa. Super. 2008). However, it is clear that neither the rule nor the case law address the situation that presents itself in this case. Here, Father is pro se. The parties have engaged in a *long* and *bitter* divorce, of which the children are well aware. Instantly, questioning three children under the age of 8 in open court, or in chambers for that matter, with only one of their parents present and doing the questioning would not further this court's inquiry as to child preference in any way. In fact, allowing Father to question the children at all in such a contentious

courtroom situation is not only barbaric, but this court sees little sense in the action as it is most unlikely that any child when questioned by a parent would indicate any preference as to living quarters *other than* living with that parent. Further, if this court would have allowed Father and Mother's counsel in chambers during the questioning, but not Mother, there is no doubt that the children would have felt such anxiety under their Father's intense questioning outside of the presence of their Mother, that they would have easily yielded under the pressure and indicated that they preferred to live with him rather than upset or anger him. Indeed, it is quite telling that none of the children indicated to this court that they believed a change in the current custody order was warranted, a degree of truth that would have doubtfully been divulged in Father's presence.

Moreover, this court notes that it asked both Father and Mother's counsel for input as to what the children should be asked and did indeed address the requested topics. Further, at no point in the trial did Father object, even once, to the court conducting the questioning in this manner, the failure of which constitutes a waiver of the issue. Instead, Father indicated to this court that he had the utmost faith in it as well as in what the children would say, and that *all* three children would request more time with him. The following relevant testimony transpired:

"The Court: All right. You may step down. All right. The way I handle interviewing children when one of the parties is acting as their own attorney, it is just me and the children and the court reporter and my staff, but I do ask the parties what areas you want me to inquire about. You want me to ask all of the children about Jessica?

"Mr. Carbo: Yes, your honor. I would ask that you also ask them on what their wants and desires are as far as a custody arrangement.

"The Court: Well, I will try to see, these children are not really of the age that the law says that we give their preferences great weight. These are smaller children. I generally keep it very general, like, well, how often do you see dad now? How do you feel about that? And maybe just, Do you want to spend more time? I ask generally what are the good things you like about each parent? Are there bad things that you don't like about each parent? But I will take suggestions.

"Mr. Carbo: I would think that a man of your wisdom that's been doing this such a long time that you know the proper questions to ask, your honor, I am comfortable with any question that you would ask my children.

"Ms. Bell: On that point, we can agree." (N.T., custody trial, 9/10/08, at 100-101.)

Not only did Father state that he deferred to the wisdom of the court, but the transcript of trial is littered with Father's comments and requests asking the court to speak with the children and indicating no objection to not being present when the event occurred. Moreover, when this court balked at conversing with the youngest child, who was just short of 5 years old, Father was so sure of what the child would say that he requested an exception be made. The testimony was as follows:

"The Court: All right. If there is nothing else, I will wait back here for the children to arrive. I will speak with them one at a time beginning with Mackenzie then Madelyn and Cassidy. Cassidy is really young. I don't know.

"Mr. Carbo: Yes, your honor. I would ask that you make an exception. She is 92 days shy of 5 years, but she is a very intelligent little girl, very mature because she has two older sisters.

"The Court: I will talk to her, and generally, I do find that it isn't all that helpful to me. Sometimes, but I think it makes them feel better that they at least had a chance to talk to the judge that is going to make these decisions, and I let them know I just I ask them, the last thing, is there anything else you wanted, something you want to tell me? It is your chance to tell me.

"Mr. Carbo: I think Cassidy would be very upset if she didn't have a chance." (N.T., custody trial, 9/10/08, at 10.)

Additionally, a court reporter was present during the questioning and transcribed the testimony of all of the children. Father and Mother's counsel each received a copy thereof, so Father was well aware of the questions asked by the court and the answers given by his children. This court illuminates the principle and calls in to doubt Father's motives, as he only expressed displeasure with the format of questioning when this court rendered its ruling and Father did not receive much more time. As this court asked for input from the parties regarding the questions asked the children, Father at no point during the trial objected to questioning in chambers without Father and Mother's counsel present, and as this court recorded the testimony and Father received a copy of said testimony, Father's contention that this court violated a rule inapplicable to this case has no merit.

Father next objects to the children being driven to court by their sister, Jessica Carbo. This issue has no bearing

on this case whatsoever. Moreover, although Father knew that the children were being driven to court by their sister, Father posed no objection nor was it even mentioned during the trial except to note the fact that Jessica Carbo would be transporting the children. There has never been any indication of impropriety nor has either party noted that Jessica Carbo was sharing the salacious details of the case with the children or coaching them on what to say. As Father appeals the order of September 15, and no objection was raised to this transportation at trial, the issue is irrelevant, frivolous, and without merit.

Father's ninth issue states that the court erred when it stopped him "from hearing testimony on Mrs. Nancy Alman and Hunter Myu." However, this court fails to see anything in the notes of testimony to support this contention. At no point in the custody trial of September 10, 2008 did Father attempt to call either of these witnesses and this court prevented him from doing so. Further, nowhere in the testimony is the name Hunter Myu even mentioned. In regard to Mrs. Alman, Trooper Dziedzic testified briefly about an altercation that occurred at Mrs. Alman's house and Mr. Carfango also noted that same incident. Nonetheless, nowhere did the court prevent Mr. Carbo from hearing testimony from either of these witnesses. In fact, the court allowed the testimony of Mr. Carfango on the incident despite defense counsel's objection. The following transpired at the custody trial:

"Ms. Bell: Your honor, based on what I am considering Mr. Carbo's offer of proof, if the purpose of this witness is to testify that he was in the car and he witnessed

a disagreement or fight between Mr. Carbo and the baby sitter's son, which occurred many, many months before the parties separated, I object. It is not relevant to why we are here today. These people don't baby-sit the children because of this incident, and it's before the court.

"Mr. Carbo: Well, Mr. Carfango can testify to the things that happened that day prior to the incident of Ms. Alman's son that it lets the court know that I am telling you the truth of what happened, the improperness that this woman had left my children alone, that Ms. Carbo had put them in a bad setting at that time.

"The Court: All right. Well, we will hear briefly." (N.T., custody trial, 9/10/08, at 11.)

Thus, as this issue is devoid of truth and finds no support in the record, it lacks all merit.

Father last argues that this court erred when it did not allow him to "give testimony on attorny (sic) John A. Hoffert, Esq." However, this issue too lacks merit as it finds no support in the record. The following testimony occurred at the custody trial when Mr. Carbo was conducting his direct examination of Ms. Mildred Carbo:

"Mr. Carbo: I would to recall I would like for you to recall an event that happened in Mr. Hoffert's office on August 6, 2006, shortly after a custody arrangement was entered in July 25, 2006. Can you recall the conversation between Mr. Hoffert, you, and I, who was representing me in my custody case?

"Ms. Bell: Objection.

"The Court: Sustained. That's not relevant.

"Mr. Carbo: Well, your honor, I think that it is if I could make a point, I was on the on the 25th on our original

custody, I was told that I could come back within the 90-day period to redo the custody within the 90 days, and I was actually that I had to go to a counselor, that I had to give custody to Ms. Carbo, and go to a counselor, and then within that 90 days, I could if I was within that 90-day period, I could come back and redo my custody. And I was I was there within a week-and-a-half to redo my custody, and I would like the court to hear Ms. Carbo's testimony on that.

"Ms Bell: You honor, I will stipulate. It is a matter of record that a temporary order was entered at the very first custody conference and that gave either party the right to relist before the custody conciliation conference officer within 90 days and, in fact, Mr. Carbo made a request to relist. We did, in fact, go back in front of the custody master at which point a recommended order was entered. I will stipulate to that. That happened.

"The Court: Well

"Mr. Carbo: Well, we didn't relist and

"The Court: Well, Mr. Carbo, this is a custody trial. I have to decide based on the situation that it is now who is to have primary custody of the children, what type of visitation for the non-custodial parent, and a conversation between you and your attorney and overheard by your mother regarding procedures that happened in 2006 has absolutely no relevance to the issue of custody today. So, Ms. Carbo, you may sit down." (N.T., custody trial, 9/10/08, at 14-16.)

Testimony referencing events that occurred in 2006 were not relevant to the current issue of the "best interests of the child." This court had no choice but to disallow testimony on an extraneous topic and to move on to the

pertinent issues regarding the parties' three small children in the interest of judicial economy and most importantly relevancy.

After a fair and thorough review of the testimony this court finds that the current order presents the parties with an arrangement most beneficial to the children and indeed was the arrangement that was in their best interest. This court highlights that the parties' three young children, none older than 8 years of age, have been residing primarily with Mother in the martial residence, while still maintaining a loving and continued relationship with Father. The Superior Court "has noted the importance to a child's development of a stable relationship with an established parental figure and a *known physical environment.*" *Pamela J. K. v. Roger D. J.,* 277 Pa. Super. 579, 589, 419 A.2d 1301, 1307 (1980) (emphasis added); see also, *Witmayer v. Witmayer,* 320 Pa. Super. 372, 382, 467 A.2d 371, 382 (1983) ("In making its award the lower court properly recognized that continuity and stability are important elements in a young child's emotional development."). We further note that none of Father's exceptions pertain to the best interest standard but instead focus on incidental and inapplicable nuances.

For all of the reasons set forth above, this court respectfully requests that Father's appeal be denied, and that the current order of September 15, 2008 remain in effect.