548 A.2d 556

**Harriet SCHWARCZ, Appellee,**

v.

**Mark Leo SCHWARCZ, Appellant.**

**Mark L. SCHWARCZ, Appellant,**

v.

**Harriet B. SCHWARCZ, Appellee.**

Superior Court of Pennsylvania.

Argued June 8, 1988.

Filed Sept. 26, 1988.

174

---

Mark L. Schwarcz, appellant, in propria persona.

Emanuel A. Bertin, Norristown, for appellee.

Before McEWEN, OLSZEWSKI and CERCONE, JJ.

OLSZEWSKI, Judge:

This appeal is from a trial court order granting primary physical and legal custody to appellee and granting partial custody with specified limitations to appellant. In this custody dispute, nine issues are presented for our review:

(1) Did the trial court err by allowing hearsay into evidence over objections by appellant?

(2) Did the trial court properly consider the option of joint custody?

(3) Did the trial court adequately discuss the evidence?

(4) Did a conflict of interest exist when appellee's counsel allegedly refused to withdraw as counsel for appellee after he joined a law firm allegedly retained by appellant and, if a conflict does exist, does it constitute reversible error?

(5) Did the trial court have authority pursuant to Section 1006 of the Custody and Grandparents Visitation Act ("Custody Act")[1] to require appellant to undergo psychotherapy?

(6) Did the trial court abuse its discretion in limiting rebuttal evidence by appellee regarding whether appellant was the primary caretaker of the children and thereby indicated its disinterest in the primary caretaker doctrine?

(7) Did the trial court abuse its discretion in failing to admonish expert witnesses who allegedly became argumentative or sarcastic when cross-examined by appellant?

(8) Did the trial court unreasonably limit appellant's visitation rights?

(9) Does the record reflect continued and significant prejudice on the part of the trial judge towards appellant, resulting in reversible error?

For the reasons below, we affirm the trial court order.

Appellant, Mark L. Schwarcz, and appellee, Harriet B. Schwarcz, were married on August 7, 1977, and separated on or about July 6, 1985. They are the parents of two minor children, Myron and Sandra.[2] On July 11, 1985, appellee[3] filed a petition to confirm custody. That same day, appellant[4] filed a petition for custody and special relief pursuant to Pa.R.C.P. 1915.13. On July 12, 1985, the Honorable Albert J. Subers entered a temporary order granting custody to appellee pending a custody conciliation confer-

1. Act of November 5, 1981, P.L. 322, No. 115, Sec. 1001, et seq., 23 P.S. Sec. 1001, et seq., repealed, Act of October 30, 1985, P.L. 264, No. 66, Sec. 3, effective in 90 days. On July 11, 1985, appellee and appellant initiated proceedings by filing, respectively, a petition to confirm custody and a petition for custody and special relief.

2. Myron's date of birth is May 20, 1979. Sandra's date of birth is August 9, 1981.

3. At all times, appellee was represented by counsel.

4. Appellant was initially represented by counsel. On June 26, 1986, however, counsel filed a petition to withdraw. This petition was granted on August 7, 1986. On October 14, 1986, new counsel appeared on behalf of appellant. Subsequently, new counsel filed a petition to withdraw, which petition was granted on January 21, 1987.

ence scheduled for August 1, 1985.[5] Counsel and the parties also agreed to a visitation schedule and certain conditions. These conditions included that appellee transport the children to and from appellant's residence for visitation.

On August 4, 1985, after an appearance before the custody conciliator and a court conference, Judge Subers directed that the current custodial arrangement with an additional mid-weekday dinner visit per week continue. Judge Subers also directed the parties' counsel to select two experts. The mutually selected experts were Andrew R. Vogelson, Ph.D., and Marshall D. Schechter, M.D.

On August 5, 1985, appellee filed a petition for special relief under Pa.R.C.P. 1915.13, requesting that the trial court enter an order prohibiting appellant from entering the premises where appellee resides.[6] The petition alleged that a confrontation had occurred during a visitation delivery at appellee's home.[7] On August 7, 1985, Judge Subers granted appellee's relief, and also ordered that appellee be prohibited from entering appellant's premises.

After submission of the written evaluation reports and recommendations by Dr. Schechter and Dr. Vogelson, respectively, and after extensive direct and cross-examination

5. The temporary order also served to vacate a previous ex parte temporary order dated July 11, 1985, granting joint custody to appellant and appellee, physical custody from Monday to Friday to appellant and physical custody from Friday until Monday to appellee.

6. Upon request of appellant, appellee had agreed to modify the existing visitation arrangement, and allowed appellant to pick up and deliver the children at appellee's residence.

7. The petition alleges in part:
Unfortunately, on Sunday, August 4, 1985, when father returned the children at mother's home (where there was to be a birthday party for mother's uncle), father lost all control in the parking lot and, in the presence of the children, mother's family, and a neighbor, began screaming and yelling profanities at mother. Mother's father told father not to speak that way and with clinched fists, father started for mother's father to beat him up, when mother's uncle stepped in front of father to prevent the beating and put his hands on father's chest to restrain him, at which time father grabbed and held mother's uncle's wrists and hurt mother's uncle, causing mother's mother to run into the home to call the police.
Appellee's petition for special relief under Pa.R.C.P. 1915.13 at 2.

of each expert by the parties, the trial court issued a temporary order dated March 13, 1986, directing that the existing custodial arrangement remain in effect subject to specific conditions. Appellant was ordered to undergo psychotherapy for the purpose of advising the trial court whether overnight visitation is appropriate. The order further included a schedule whereby overnight visitation and its extension was dependent upon completion of psychotherapy sessions by appellant.[8] Dr. Schechter diagnosed appellant as suffering from a paranoid personality disorder[9], and expressed concern regarding appellant's stability. He strongly recommended that primary custody be vested in appellee, and advised against granting overnight visitation to appellant during a reevaluation period. During this reevaluation period, Dr. Schechter recommended that appellant undergo psychotherapy.

On December 11, 1986, appellant filed a pro se motion for recusal of the Honorable Joseph A. Smyth. On March 24, 1987 custody hearings continued and, in open court, appellant confirmed that he had sent a letter to Judge Smyth withdrawing his motion for recusal. On November 16, 1987, the trial court issued its order, awarding custody to appellee and partial custody to appellant with specified conditions. By trial court order of December 7, 1987, the above-captioned cases were consolidated for purposes of appeal. This timely appeal followed.

■ Our paramount concern in custody matters is the best interest of the child, including the child's physical, intellectual, emotional and spiritual well-being. *Brooks v. Brooks*, 319 Pa.Super. 268, 466 A.2d 152 (1983). In these matters, our scope of review is broad. *Burke v. Pope*, 366

---

**8.** The trial court also ordered appellee to undergo counseling with Margaret Cooke, and further provided for Dr. Schechter, at the request of either party, to submit an updated evaluation to the trial court. We also note that the trial court issued a subsequent order whereby appellant was required to undergo psychotherapy at the direction of a different psychologist. This change was at appellant's request.

**9.** Dr. Vogelson diagnosed appellant as having a borderline personality disorder or antisocial personality disorder.

Pa.Super. 488, 492, 531 A.2d 782, 784 (1987); however, "...
this broader power of review was never intended to nullify
the fact-finding function of the hearing judge. It is a
principle which runs through all our cases that the credibili-
ty of witnesses and the weight to be given to their testimo-
ny by reason of their character, intelligence, and the knowl-
edge of the subject can best be determined by the judge
before whom they appear." *Lombardo v. Lombardo*, 515
Pa. 139, 147, 527 A.2d 525, 529 (1987) (citations omitted).
We, therefore, are "empowered to determine whether the
trial court's incontrovertible factual findings support the
trial court's factual conclusions, but may not interfere with
those conclusions *unless they are unreasonable in light of
the trial court's factual findings....*; and thus, represent
a gross abuse of discretion, ... (Emphasis in original)."
*Id.*, 515 Pa. at 148, 527 A.2d at 529, *quoting Robinson v.
Robinson*, 505 Pa. 226, 237, 478 A.2d 800, 806 (1984) (cita-
tions omitted).

■ Having set forth our scope of review, we turn to
appellant's first contention. Appellant asserts that the trial
court committed error in permitting hearsay to be admitted
into evidence over objections. Appellant identifies a num-
ber of statements for our review. Initially, we note that,
contrary to appellant's contentions, certain statements were
introduced without objection. We, therefore, hold that ar-
guments pertaining to those statements are waived.[10] For

**10.** It has been held that the waiver doctrine is inapplicable in custody
disputes. *See Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307
(1976); *In re Custody of Frank,* 283 Pa.Super. 229, 423 A.2d 1229
(1980); *but see Ellingsen v. Magsamen,* 337 Pa.Super. 14, 486 A.2d 456
(1984). We, however, follow the rationale of our Supreme Court in
*Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984). In *Robinson,*
the Court held "that Superior Court erred by raising, sua sponte,
issues respecting the propriety of the trial court's admission and
consideration of the home investigation reports and the school report
cards." *Id.,* 505 Pa. at 234, 478 A.2d at 805. Although the issue in
*Robinson* involved the failure to preserve an issue on appeal, we find
its rationale applicable where an issue is not preserved at trial. In
reaching its holding, our Supreme Court stated:
 We recognize that the ultimate issue in a custody contest between
 parents is that of whether the best interests of the child lie in
 granting custody to one parent or the other. *Commonwealth ex rel.*

example, appellant contends that the updated evaluation report by Dr. Marvin Schechter "was based in part on hearsay statements allegedly made by the parties' children, and related to the psychiatrist by the mother." Appellant's brief at 11. Appellant specifically points to a statement in Dr. Schechter's written evaluation that "Myron reports also that his father uses 'tickle torture' to the point where Myron then throws up." Plaintiff's exhibit dated December 29, 1986, at 2. We note that, contrary to appellant's contention, the record is devoid of any objection to the introduction of the report into evidence as hearsay. We, therefore, find the hearsay objection waived in regard to the report and its contents. *See Ellingsen v. Magsamen*, 337 Pa.Super. 14, 486 A.2d 456 (1984). Likewise, we find that appellant's hearsay claim in regard to Dr. Schechter's in-court testimony pertaining to the same statement is waived. No objection was made when Dr. Schechter testified. Furthermore, appellant did not object when appellee testified that the children tell her " '[i]f we want to wake Daddy up, all we have to do is tell him that we're going to call Mommy and that will get him out of bed, fast.' " N.T. April 6, 1987, at 138. Thus, any hearsay argument is waived in regard to this testimony.

■■■■ Appellant also contends that the trial court erred in admitting "reports prepared by teachers of the children." Appellant's brief at 12. Appellant objected to four exhibits allegedly prepared by the children's teachers and offered by appellee. Appellant's objections to two of the exhibits were sustained. The trial court, however, admitted the other two exhibits, finding that the exhibits were prepared pursuant to one's function as a school teacher. School records may qualify as business records. *See Phillippi v. School Dis-*

> *Pierce v. Pierce*, 493 Pa. 292, 426 A.2d 555 (1981). We do not believe, however, that 'interminable and vexatious litigation,' which abrogation of the waiver doctrine would promote, is any better a method for achieving a just result in a child custody case than it would be in any other type of proceeding before the courts. *See Daniel K.D. v. Jan M.H.*, 301 Pa.Superior Ct. 36, 40 n. 2, 446 A.2d 1323 n. 2 (1982).
> *Id.* 505 Pa. at 232, 478 A.2d at 804.

*trict of Springfield Township,* 28 Pa.Cmwlth. 185, 367 A.2d 1133 (1977).[11] Pursuant to the Uniform Business Records As Evidence Act,[12]

> A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S.A. § 6108(b).

Instantly, the record discloses that no testimony by a "custodian or other qualified witness" was presented by the party offering the exhibits. Rather, the trial court admitted the exhibits upon its own examination of the exhibits without any foundation, stating:

> This is a status report as to how they are doing in school, P–26. And it is signed. It is not just typewritten. And it is signed by three people. It purports to be the signature of three teachers at school, and there are three different signatures. I don't think anyone forged them. I think that is a school record. And I think that P–25 is a school record. And I will admit that.

N.T. April 6, 1987 at 167.

> P–28 is admissible. That's a report of Sandra Schwarcz, for the same reason the report of Myron is admissible.

N.T. April 6, 1987 at 168.

■ We find that the trial court followed inappropriate procedures in admitting the updated school records into evidence over the objection of appellant. We, however, find that the conclusion reached by the trial court is supportable

**11.** Contrary to appellee's contention, the report cards in this matter do not constitute official records. Pursuant to 42 Pa.C.S.A. § 6104, official records are defined as "a copy of a record of governmental action or inaction." The report cards of a private school do not constitute such a record.

**12.** Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S.A. § 6108.

even without resort to the two updated school records and, therefore, we will not reverse on these grounds. *Moorman v. Tingle,* 320 Pa.Super. 348, 356, 467 A.2d 359, 363 (1983).

Appellant also points to specific testimony by appellee during direct examination whereby appellee relates what each child told her regarding: (1) what appellant stated to each child and (2) what took place between each child and appellant. We find the trial court did not err in admitting appellee's testimony "for the purpose of establishing what was in the minds of the children, and the impact upon the children of [appellant's] conduct...." *In re Rinker,* 180 Pa.Super. 143, 154, 117 A.2d 780, 786 (1955). We note, however, that the trial court relied on the following testimony for the truth of the matter asserted: [13]

> Myron came crying to me once that Daddy took him—not taking him nicely out of the bathtub and accidently having him slip with his body into the toilet, but Mark was on the telephone, and Myron had interfered, and so Mark took him by his hair into the bathroom, put his head to the top of the toilet seat and said to him, 'If you don't listen to me, I will put your face in the toilet.' His head actually touched the toilet seat.

N.T. January 7, 1986 at 248–249. Appellee further testified:

> And in fact, I discussed it with Mark. We had a big discussion about that, because as far as I am concerned, you don't do that to any human being.
>
> BY [APPELLEE'S COUNSEL]:
>
> Q And what did Mark say?
>
> A He justified what he did. He felt he was right, Myron had interfered with what he was doing, and he had no right to do that.
>
> Q He didn't deny what he did?

**13.** In its opinion, the trial court seriously questioned appellant's ability to appropriately discipline his children. It referred to a number of instances of record to support its factual conclusion including appellant's act of "put[ting Myron's] head to the top of the bathroom toilet, and threaten[ing] to put Myron's face in the toilet. (N.T. 1/7/86, 249)." Trial court opinion at 11.

A No. He admitted that he did it.

N.T. January 7, 1986 at 249–250.

Appellant was not prejudiced by the trial court's reliance on Myron's statements as related by appellee. In addition to testifying to what Myron said, appellee testified that she discussed the episode with appellant. During this discussion, appellant justified and admitted that he disciplined Myron in the manner described by appellee. This additional testimony provides competent evidence of appellant's admissions [14] and, thus, corroborates any hearsay testimony.

■ Appellant also claims that the trial court erred in admitting the following testimony by appellee:

Q *What has Mr. Schwarcz told you he intends to do with the children should he get custody or have a right to decision making?*

A *He not only told me,* but something that really frightened the principal and teachers of the school, he said that the moment he gets custody of the children, he will pull them out of the school. And they brought this to my attention.

N.T. April 6, 1987 at 111. (Emphasis added.)

We find that appellant was not prejudiced by the above testimony. Appellee testified that appellant informed her of these same intentions. The record further bears this out when appellee stated:

Q *When was the last time you had discussion with Mr. Schwarcz about what you just testified to?*

A *After the reports came out,* because in spite of the fact that—not after the last—not after P-29, but after P-28—because I was very concerned, because the children came crying to me that Daddy wants to take us out of Solomon Schechter, he wants to put us in a different school, he wants to puts us in Beth Jacob—

N.T. April 6, 1987 at 111. (Emphasis added.)

■ Appellant further claims that the trial court erred in allowing appellee to testify regarding recommendations by

14. *See* McCormick, On Evidence, § 262 (3 Ed.1984) (admissions of a party come in as substantive evidence of the facts admitted).

teachers as related to appellee by Margaret Cooke. Instantly, we find the trial court properly permitted the testimony for the limited purpose of knowing what appellee did in response to the recommendations.[15] Without knowing what the recommendations were, the trial court cannot properly assess appellee's response. We, therefore, find no error.

■ Second, appellant asserts that the trial court did not properly consider the option of joint custody. We disagree. Pursuant to the Custody Act,[16] a trial court has broad discretion in awarding shared custody. See section 1005 of the Custody Act; *Agati v. Agati*, 342 Pa.Super. 132, 492 A.2d 427 (1985). In *In re Wesley J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982), this Court set forth the following guidelines in determining when an award of shared custody is appropriate:

(1) "[B]oth parents must be 'fit.' Both parents must be sane and capable of making rational child-rearing decisions. Both must be willing and able to provide love and care for their children.";

(2) There must be "a desire on the part of both parents for a continuing active involvement in their child's life.";

(3) "[T]he child has formed a relationship with both parties."; and

(4) "There is a minimal degree of cooperation between the natural parents."

*Id.*, 299 Pa.Superior Ct. at 515–516, 445 A.2d at 1248–1249.

■ Appellant specifically argues that the trial court erred in its determination of appellant's fitness and in its determination of the degree of cooperation between appel-

15. The trial court responded to appellant's objection, stating: "I will allow it because I want to know what was recommended and what she did." N.T. April 6, 1987, at 101.

16. Appellant incorrectly alleges that section 1002 of the Custody Act creates a presumption in favor of joint custody. "Although shared custody in appropriate circumstances is desired, under the new legislation there is no presumption favoring shared custody." *Wesley*, 299 Pa.Super. at 514, 445 A.2d at 1248.

lant and appellee.[17] In the instant matter, the trial court held that "it is [appellant's] inability to control his emotions, his attitude about the children's schooling, and the fact that he is a poor role model for his children, that compels the court, in the best interests of the children, to award physical custody of the parties' minor children to [appellee]." Trial court opinion at 6. It reiterated these same factual conclusions to support its award of sole legal custody,[18] and further stated:

> [M]other and father are in constant disagreement as to child-rearing decisions. They simply can not agree on anything. It is in the best interests of the children that they maintain certainty and continuity in their lives. The court feels that the only way to ensure continuity and stability is to grant mother sole legal custody.

Trial court opinion at 13–14.

In examining the record before us, we find that there is sufficient, competent evidence to support the trial court's conclusion that appellant is not "fit." The trial court refers to a number of examples from the record indicating that father's personality directly bears on his ability to parent. One such example is the gun incident that took place at

**17.** Appellant also presents for our review a discussion of articles expressing the advantages of shared custody arrangements and the disadvantages of sole custody awards. We note, however, that the legislature recognized that a shared custody arrangement is not always in the best interest of the child and, therefore, provided the trial court broad discretion in its determination of when a shared custody award is appropriate. *See Wesley,* 299 Pa.Super. 504, 445 A.2d 1243 (1982).

**18.** The trial court stated:
Concerning father's fitness to parent, the court again notes that father is a poor role model who has trouble controlling his behavior. The court feels that father's behavior and attitudes would interfere with his ability to do what is in the children's best interests in their established schooling, religious upbringing, and social interaction. The court recognizes that father is an intelligent man who loves his children and wants to be part of their lives; however, it is father's inability to control his emotions, his poor role modeling, as well as the fact that he and mother cannot agree on anything concerning child-rearing, that compels this court to grant mother sole legal custody.
Trial court opinion at 16.

Myron's birthday party in the presence of the children, family and friends. The trial court writes:

On May 20, 1985, mother and father gave a birthday party at their home for their son, Myron. Several children, relatives, and adult friends were in attendance. During the party, an incident occurred wherein father brandished a loaded pistol at workmen spreading fertilizer outside his home. In front of the guests, father challenged the workmen to call the police and subsequently threatened mother while she was on the phone with the police.

Father unloaded the gun before the police arrived and when confronted by the police he lied and tried to convince them that the gun in question was actually a toy gun. Eventually, after the party was dispersed by the police, father produced the real gun, but again lied and claimed it was unloaded during his confrontation with the workmen. It was while discussing this incident with Dr. Vogelson that father stated, "I don't always understand why I do what I do." (N.T. 1/6/86–89).

Trial court opinion at 8–9.

In addition, the trial court refers to two specific confrontations: (1) one alleged in appellee's petition for special relief,[19] and testified to by an eyewitness; and (2) another between appellant and appellee's mother. The confrontation between appellant and appellee's mother involved an argument during which appellant punched appellee's mother in the eye in response to appellee's mother slapping appellant for using profane and abusive language. As a result of appellant's actions, appellee's mother was required to undergo immediate medical care and a subsequent visit to an ophthalmologist. In addition to these examples, the trial court relied upon Dr. Vogelson's expert testimony in its analysis:[20]

19. *See supra,* note 6.

20. The trial court also mentioned the testimony of Hillel Raclaw, Ph.D., who testified on behalf of appellant. The trial court states:

... [Dr. Vogelson] found that there was reason to seriously question father's capacity to parent independently at times. (N.T. 1/6/86–94). Based on his evaluation of father, Dr. Vogelson predicted that "there could be situations where he could become angry or simply not consider the implications of his behavior or his not taking action, which could put the children in danger." (N.T. 1/6/86–97)....

Trial court opinion at 7. We further note that the trial court refers to matters of record indicating that appellant serves as a poor role model for the children. These include appellant's driving habits, placing appellant and, many times, the children in danger; violation of automobile licensing laws; and lying in the presence of the children. Relying on these matters, the trial court also expressed concern regarding "[appellant's] ability to properly guide the children in decision making." Trial court opinion at 12.

There is also sufficient, competent evidence to support the trial court's conclusion that "[appellant] and [appellee] are in constant disagreement as to child rearing decisions." Trial court opinion at 13. Disagreements pertain to what school the children should attend, whether the children should be involved in Scouting activities, and whether the children should be permitted to enroll in activities at a Christian YMCA. Generally, the record reflects discord in regard to the children's religious upbringing and social interaction. Appellee testified:

> Dr. Raclaw's second report, the result of a home visit with father and children, dated July 31, 1986, concerned father's interaction with the parties' children regarding possible custodial arrangements. Dr. Raclaw took issue with the opinions of the previous experts and determined that father had the capacity to parent his children and was capable of caring for them on a 24 hour basis. (N.T. 1/26/87—498).

The trial court, however, continued:

> Notwithstanding certain inconsistencies among the expert testimony, the record clearly demonstrates that father has great difficulty responding rationally to emotional stress. There are several instances of record where father has used inappropriate conduct in the context of the situation.

Trial court opinion at 8. The trial court then proceeds to present examples of record.

... I feel that the children, even at this stage, have a very strong identity through everything that they have done, not only at school, but at home and other activities. And I feel that even the school encourages education as far as different religions are concerned and different cultures are concerned. And I feel that even at this stage, this is the age that you prevent a child from growing up to be prejudiced, not the other way around.

N.T. April 9, 1987, at 112.

Appellant, however, admitted objecting to appellee's enrollment of Myron in the Boy Scouts because he wanted Myron "to be involved in more Jewish activities." N.T. April 9, 1987, at 92.[21] Appellant also explained his opposition to appellee's enrollment in the Christian YMCA:

Q And the YMCA situation, which she was enrolling them, you objected to that, as well, isn't that right, on the lines that it was non-Jewish, not exclusively Jewish.

A I objected to their becoming members of the YMCA. They were at a very young age. And there's a lot of symbolism there of the various Christian holidays. And at that tender age, since they're already exposed to a lot of Christian symbolism and customs just living in this country, and T.V. and in stores and in such, that I thought that at a young age, they should go to a Jewish Y.

BY THE COURT:

Q At what age do you think they should be allowed to go to a Y where they are exposed to some of these things

---

**21.** Appellee testified:

Q. How about Boy Scouts and Girl Scouts?
A. [Appellant] said that—[appellant] stated that the children should join Orthodox Youth Groups, that Boy Scouts and Girl Scouts were not what he wanted them to be involved with.
Q. And what is your view on that?
A. I want them exposed to that. I think the Boy Scouts and Girl Scouts are excellent organizations.
Q. Why will he not allow them to be in the Boy Scouts and Girl Scouts? What has he told you about that?
A. He'd prefer them to be involved with the Orthodox Jewish children as opposed to being involved with a mixed group.

N.T. January 7, 1986, at 203–204.

that you are exposed to in this country? I mean you act like you are against it at a young age, but you are not against it at an older age.

A That is correct.

Q Where does that start?

A I am not sure. I would think it would be a gradual thing, not a fixed line or point.

As I think I have stated earlier to the Court, I feel that the impressions on a child when he is young are the ones that are the most important in his development and formation and his religious feeling. And I am very concerned about that.

N.T. April 9, 1987, at 92–93. Furthermore, Dr. Schechter testified:

Q. How important in your opinion is it that she have the legal custody, as opposed to there being shared legal custody?

A. I can see no way in which these two people can agree on any particular matters. The importance is not only in that regard to which the children will be subject to constant series of differences of opinion and conflict, to a point where decisions might not be made in their favor and to meet their needs.

But also that I think that the children under the circumstances that they're currently existing are progressing well.

N.T. March 30, 1987, at 14. The record clearly demonstrates the parties' incapability to cooperate on matters of importance to the children.

We further find appellant's reliance on *Brown v. Eastburn*, 351 Pa.Super. 479, 506 A.2d 449 (1986), and *Murphey v. Hatala*, 350 Pa.Super. 433, 504 A.2d 917 (1986), *alloc. dn.* in 516 Pa. 634, 533 A.2d 93 (1987), is misplaced. In *Brown*, this Court found that the record demonstrated a minimal level of parental cooperation to support an award of shared custody. We recognized the following factors as indicative of this cooperation: (1) the parties had stipulated to a shared custody arrangement; (2) the parties had engaged in

a significant amount of negotiating and compromising in the implementation of a prior custody arrangement; and (3) mutually selected experts recommended an award of shared custody.

Instantly, we note that the mutually selected expert, Dr. Schechter, did not recommend an award of shared custody.[22] In addition, although the parties in this case initially agreed to a visitation schedule, with specified conditions, problems quickly arose after appellee agreed to modify the existing arrangement and allow appellant to pick up and deliver the children at her residence. As a result, court intervention was required in the form of an order prohibiting appellant and appellee from entering each other's premises. Thus, we find *Brown* distinguishable.

In *Murphey*, this Court found that the trial court's factual findings, including the finding that "the parties ha[d] insurmountable problems in their relationship which would render a shared custody scheme unworkable ...," were not supported by the record. We stated:

> We acknowledge the testimony in the record as to the discord between the parties and as to their day to day problems and inconveniences. There is also extensive testimony, however, from all three expert witnesses, and the parties themselves, stating that *the majority of these problems* stem from the friction caused by the frequency of [the child's] exchange between the parties. All the experts testified that these problems could be overcome with a custody plan affording [the child] larger blocks of time with each parent, thereby lessening the contact time between the parents and consequently reducing their conflicts.

*Id.* 350 Pa.Super. at 441, 504 A.2d at 921 (citations omitted, emphasis in original). Thus, in *Murphey*, the focus was not on whether a shared custody arrangement was appropriate, but what type of shared custody scheme would work. This

22. Dr. Vogelson did not specifically recommend a particular custody arrangement.

is not the issue before us. We, therefore, find *Murphey* distinguishable.

■ Third, appellant asserts that the trial court did not adequately discuss the evidence. Specifically, appellant alleges that the trial court failed to mention any of the evidence presented by appellant [23] and any of the arguments raised in appellant's trial brief.[24] In reviewing a trial court's custody determination, we require that the trial court:

> ... provide us with a complete record and a comprehensive opinion which contains a thorough analysis of the record and specific reasons for its ultimate decision. *Cady v. Weber*, 317 Pa.Super. 481, 464 A.2d 423 (1983); Pa.R.C.P. No. 1915.10—Explanatory Note—1981. The appellate courts require an opinion which demonstrates that the trial judge in a custody case has analyzed the record as a whole and has dealt with significant factual disputes in a manner which will enable the appellate courts to understand the reasons for the decision and to make an intelligent evaluation of the opinion and of the testimony; the judge need not discuss the testimony of each witness or make citations to the transcript. *Sandra L.H. v. Joseph M.H.*, 298 Pa.Super. 409, 444 A.2d 1241 (1982). The lower court's opinion need not discuss all the evidence presented or state why some evidence is regarded as more persuasive.

*Heddings v. Steele*, 344 Pa.Super. 399, 496 A.2d 1166 (1985), *aff'd.*, 514 Pa. 569, 526 A.2d 349 (1987). We find that the trial court sufficiently discussed the factors it found significant and relevant in reaching its ultimate decision.

Appellant relies on this Court's decision in *Kimmey v. Kimmey*, 269 Pa.Super. 346, 409 A.2d 1178 (1979), to support his contention that "the trial court must provide a

23. Appellant acknowledges that the trial court referred in its opinion to the expert testimony of Hillel Raclaw, Ph.D., who testified on behalf of appellant.

24. Appellant also alleges that the trial court's opinion is replete with factual misstatements. We find that the trial court's factual findings, as reported in its opinion, are supported by the record.

complete and comprehensive opinion with detailed analysis of the evidence if it is to avoid error." Appellant's brief at 17–18. In *Kimmey,* father appealed from a trial court order awarding custody to mother. During the custody proceedings, witnesses, on behalf of father, testified that the parties' children were not properly fed, cleaned, or supervised under mother's care. In spite of this testimony, the trial court opinion discussed an argument that occurred between the parties, father's attempt to negotiate custody by requesting that mother relinquish certain property rights, and father's threat to take the children to Canada or Australia. This Court found that the trial court failed to file a comprehensive opinion. Instantly, *Kimmey* is distinguishable. In *Kimmey,* important testimony that provided evidence of a party's conduct having a harmful effect on the children was not mentioned in the trial court's opinion. In this case, the trial court sufficiently stated its reasons for its decision, relying on relevant, important evidence that directly bears on the issue of the best interest of the child.[25]

Appellant's reliance on *Commonwealth ex rel. Newcomer v. King,* 301 Pa.Super. 239, 447 A.2d 630 (1982), is also misplaced. In *Newcomer,* the trial court awarded custody to father, finding that "both parents were capable of providing for the child, but that custody should remain with [father] because of the stable relationship between father and son...." *Id.,* 301 Pa.Superior Ct. at 245, 447 A.2d at 633–634. Father had absconded with one of the children to California prior to a hearing date and was held in contempt for failing to appear before the court. Upon return to Pennsylvania, father was arrested. This Court held that the trial court's opinion was deficient for a number of

25. Appellant also refers us to *In re Custody of White,* 270 Pa.Super. 165, 411 A.2d 231 (1979). We find that *White* is distinguishable on the same basis as *Kimmey.* This Court in *White* remanded for the entry of a full opinion, finding that the trial court dwelled at length on father's extramarital affairs that may have triggered the dissolution of the marriage, rather than "exploring the qualities of the parents which might best serve the children" and commenting "on whether it believed the children [were] adversely affected by appellant's affairs." *Id.,* 270 Pa.Superior Ct. at 168, 411 A.2d at 233 (footnote omitted).

reasons. These reasons included the trial court's: (1) failure to provide a comprehensive analysis of father's actions and, thus, implying a possible misunderstanding of the law; [26] (2) inclusion of factual findings that, without sufficient explanation, were unsubstantiated by the record; (3) failure to make reference to a report that was ordered by the trial court and had delayed the court's determination until results were known; (4) failure to include a discussion of the policy that absent compelling reasons, siblings should remain in the same household; and (5) failure to assess the credibility of witnesses in light of conflicting testimony.

■ In the instant case, the trial court provided a comprehensive analysis, applying the best interest of the child standard and properly reviewing the option of shared custody. Appellant asserts that the trial court did not discuss the application of the primary care doctrine. As we previously stated, we find that the trial court's findings support the conclusion that father is not "fit" and, therefore, the primary care doctrine would not come into consideration. We do not require the trial court to discuss the nonapplicability of every doctrine or policy in child custody matters. We also note that, unlike *Newcomer*, the trial court properly considered recommendations of experts who were mutually selected by the parties at the request of the trial court. Furthermore, we find that it is unnecessary to remand this case for an assessment of the credibility of witnesses. The trial court, when relying on conflicting expert testimony,

26. This Court in *Newcomer* stated:
 The lower court, in its opinion, merely mentioned the absconding of the child by Jeffrey King and concluded that 'the child should not be punished for the transgressions of a parent.' We find this brief analysis to be insufficient in light of the court's award of custody to the father. The court's statement appears to imply that if a parent violates the law by kidnapping his or her child, and then remains in isolation for a substantial period of time, then, because of the importance of the element of stability, he or she will have a better chance of gaining permanent legal custody of the child. This is not the law. Except in unusual circumstances, estrangement of a child from either parent will not be sanctioned. *Pamela J.K. v. Roger D.J.*, [277 Pa.Super. 579, 419 A.2d 1301 (1980)].
 *Id.* 301 Pa.Super. at 246, 447 A.2d at 634.

explained the basis for its reliance. Moreover, the trial court supports its decision with evidence that is many times uncontradicted or corroborated.

 Fourth, appellant contends that a conflict of interest existed when appellee's counsel refused to withdraw as her counsel after joining a law firm which appellant had retained [27] and, thus, reversible error exists. On March 24, 1987, prior to the commencement of the continued custody hearings, appellee's counsel presented to the trial court and appellee that he was currently negotiating with the law firm, Abrahams and Loewenstein, for a position as partner with the firm. He further disclosed to the trial court and appellee that, during negotiations, it was brought to his attention that appellant had consulted with Saul Levit, Esquire, a partner of Abrahams and Loewenstein, in regard to this custody dispute.[28] The trial court questioned appellee's counsel as follows:

**27.** The record does not substantiate appellant's allegations that appellee's counsel refused to withdraw as counsel for appellee nor that appellant retained the law firm in question.

**28.** On the record, appellee's counsel stated:

... I would like to put on the record that I advised [the trial court] and [appellant] of the fact that at the present time I am negotiating with the law firm of Abrams (sic) and Loewenstein on the basis of possibly becoming a partner with that firm as of this date; however, there has been no concrete offer coming forth from that firm with respect to that. However, in the course of the negotiations and discussing several cases, [this] case was mentioned and I discovered that sometime ago [appellant] met with Saul Levit in the Philadelphia office of Abrams (sic) and Loewenstein and asked Mr. Levit to review his case. And I understand that Mr. Levit did review it.

[Appellant] never in fact retained Mr. Levit or the law firm of Abrams [sic] and Loewenstein to actively represent him. [Appellant] has been represented by Lynne Gold–Bikin and Neil Hurowitz. The reason for my bringing this up at this time is that I wanted to avoid any appearance of impropriety in the event that I should receive an offer and accept it. And if that were so, then I would assume that I would become a partner in Abrams (sic) and Loewenstein several months from today.

And in that event what I would contemplate at that time—we could cross that bridge at that time of course—is to have the file at Abrams (sic) and Loewenstein sealed by an order of court and the direction that I not discuss any information that was given to Mr. Levit about this case.

THE COURT: So my understanding is in the process of your negotiations with this firm you've learned that [appellant] has consulted with Saul Levit. However, you're not privy to any of the communications between [appellant] and Mr. Levit. Is that correct?

[APPELLEE'S COUNSEL]: That's correct. And I also learned today that the meeting took place sometime in the summer of 1986.

[APPELLANT]: That's correct.

THE COURT: So we put that on the record. Fine. Let's go to court. There's nothing else to say. It has been placed on the record.

N.T. March 24, 1987, at 4.

We find that appellant was not prejudiced by appellee's counsel's negotiations. The record indicates that appellee's counsel was not privy to any information Mr. Levit may have acquired as a result of appellant's consultation. We, therefore, hold that no reversible error occurred.

 Fifth, appellant contends that the trial court has no authority under Section 1006 of the Custody Act to require appellant to undergo psychotherapy.[29] Specifically, appellant contends that Section 1006 limits the trial court to order a parent to undergo "counseling" which is distinct from "psychotherapy." Appellant asserts, "[c]ounseling suggests a conversational give and take as well as the receiving of advice" whereas "[p]sychotherapy indicates in depth treatment for a psychological problem." Appellant's brief at 40.

> And I feel comfortable bringing it up now. Of course in the event I do not become a partner it couldn't have hurt to make this disclosure....
> N.T. March 24, 1987, at 2–4.

**29.** Appellant also contends that he was prejudiced by the consequences of the temporary order. Specifically, appellant alleges that he was prejudiced by a six-month delay, and prejudiced as evidenced by the trial court's "indirect indication that [appellant's] failure to engage in therapy would substantially harm his chances of success in the case." Appellant's brief at 41. Appellant fails to substantiate his allegations by reference to the record nor does he explain how he was prejudiced by the six-month delay. We, therefore, do not reach this contention.

In interpreting the Custody Act, we are guided by the principles of the Statutory Construction Act.[30] We must "ascertain and effectuate the intention of the General Assembly," and construe every statute, "if possible, to give effect to all its provisions." 1 Pa.C.S.A. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). "When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering [a number of factors]."[31] 1 Pa.C.S.A. § 1921(c).

With these principles in mind, we turn to Section 1006 of the Custody Act. Section 1006 reads in pertinent part:

(a) The court may require the parents to attend counseling sessions and may consider the recommendations of the counselors prior to awarding sole or shared custody. These counseling sessions *may include but shall not be limited to* discussions of the responsibilities and decision making arrangements involved in both sole and shared custody and the suitability of each arrangement to each or both parent's capabilities.

(b) The court may temporarily award custody to either parent or both parents, pending resolution of any counseling.

23 P.S. § 1006(a) and (b) (emphasis added).

We are to construe words according to their common usage, 1 Pa.C.S.A. § 1903; however, we cannot ignore the

---

**30.** Act of December 6, 1972, P.L. 1339, No. 290, 1 Pa.C.S. Sec. 1501 *et seq.*

**31.** These factors include:
(1) The occasion and necessity for the statute.
(2) The circumstances under which it was enacted.
(3) The mischief to be remedied.
(4) The object to be attained.
(5) The former law, if any, including other statutes upon the same or similar subjects.
(6) The consequences of a particular interpretation.
(7) The contemporaneous legislative history.
(8) Legislative and administrative interpretations of such statute.
1 Pa.C.S.A. § 1921(c).

definition or explicit language contained in the statute. 1 Pa.C.S.A. § 1921(b). By its explicit language in Section 1006(a), the legislature does not limit its definition of counseling sessions. Rather, it provides an expansive definition and, thus, enables the trial court to exercise its discretion in framing an order. In exercising its discretion, the trial court, of course, must be mindful of the stated legislative purpose of the Custody Act. The legislature states "that it is the public policy of this Commonwealth, when in the best interest of the child or children, to assure a reasonable and continuing contact of such child or children with both parents after a separation or dissolution of marriage, and the sharing of the rights and responsibilities of child rearing by both parents." 23 P.S. § 1002. The trial court, therefore, has authority to require psychotherapy of a parent if the psychotherapy "assure[s] a reasonable and continuing contact of such child or children with both parents after a separation or dissolution of marriage." *Id.* In the instant case, the trial court issued a temporary order stating in pertinent part:

> [Appellant] is directed to contact Michael Parrish, PhD, ... for the purpose of establishing an arrangement whereby [appellant] undergoes psychotherapy at the direction of Dr. Parrish. The cost of such thereapy (sic) is to be paid by [appellant]. The purpose of such thereapy (sic) is to advise the undersigned as to whether overnight visitation with Children and [appellant] is appropriate at this time.

Trial court temporary order dated March 13, 1986.

We find that the trial court did not abuse its discretion in issuing a temporary order requiring appellant to undergo psychotherapy for the "purpose of advising the trial court as to whether overnight visitation with Children and [appellant] is appropriate...." The stated purpose of the trial court order is consistent with the stated policy of the legislature to encourage contact with the children. In addition, we note that the trial court's order is consistent with Dr. Schechter's recommendation.

■ Sixth, appellant contends that the trial court indicated its disinterest in the primary caretaker doctrine by limiting rebuttal evidence by appellee regarding whether appellant was the primary caretaker of the children. Specifically, appellant points to the following statement by the trial court as an indication of its disinterest in the primary caretaker doctrine:

There is a disagreement over percentages. And there, you get back into perceptions. And I am sure that any spouse in any marriage honestly believes they do more than they do ... and I don't think you have to spend a whole lot of time disputing what was done in the past.

Appellant's brief at 43, *quoting* transcript dated April 9, 1987, at 107.[32]

---

**32.** During rebuttal, appellee testified:

Q: He said about the chores in the house, that he did it because you couldn't lift and you had no time or you had no energy.
A: As I said, again, the chores, he did fifteen to twenty percent of the time. One of our biggest areas of fighting was the fact that he was home a lot, he was playing tennis, playing chess, I was working, the children were at the babysitter's, he wasn't even working, and in spite of all that, he really didn't do that much.

N.T. April 9, 1987, at 107.

The trial court limited rebuttal, stating:

I don't think we have to go through this kind of rebuttal. She admits he did it. There is a disagreement over percentages. And there, you get back into perceptions. And I am sure that any spouse in any marriage honestly believes they do more than they do or the other one doesn't do as much.

And I don't disagree that Mr. Schwarcz is generally concerned about his children, and that he loves them, and wants very much to be a part of their lives, and that he has done a number of things for them as they were growing up. As children grow older, their needs change. They don't need their diapers changed anymore. And their needs when they go into their teens are different than their needs right now. And I don't think you have to spend a whole lot of time disputing what was done in the past.

The issues in this case are how both parties—you have the issue concerning the Orthodox versus the Conservative, the religious issue, and whether shared legal custody would work. But in view of all the allegations about Mr. Schwarcz and the expert testimony, the critical issues are his mental ability, if the experts are right, and if they are wrong, how he reacts under stress and how he reacts emotionally, and whether he does color things. They are the things that I am really going to have to scrutinize the record over, not

We find no merit in this contention. In *Commonwealth ex rel. Jordan v. Jordan*, 302 Pa.Super. 421, 448 A.2d 1113 (1982), this Court held "that where two natural parents are both fit, and the child is of tender years, the trial court must give positive consideration to the parent who has been the primary caretaker." *Id.*, 302 Pa.Superior Ct. at 425, 448 A.2d at 1115. (Footnote omitted.) In addition, we recognize that the trial court must provide us with a complete record in child custody disputes. *K.L.H. v. G.D.H.*, 318 Pa.Super. 330, 464 A.2d 1368 (1983). Perusal of the record reveals that the trial court allowed appellant to testify regarding his role as the primary caretaker. We disagree that the trial court's statement indicates a disregard of the proper application of the primary care doctrine. Rather, the trial court properly exercised its discretion in limiting rebuttal evidence. *See Neal by Neal v. Lu*, 365 Pa.Super. 464, 530 A.2d 103 (1987) (Admission or rejection of rebuttal evidence is within the discretion of the court.).

Appellant's seventh contention is also without merit. Appellant argues that "[o]n numerous occasions, Dr. Schechter and Dr. Vogelson became argumentative or sarcastic when cross-examined by father," and "the trial Court did little to admonish the witnesses to answer father's questions." Appellant's brief at 43. Our review of the record indicates that the trial court did not abuse its discretion. In fact, appellant's specific reference to the record indicates that the trial court directed the witness, Dr. Vogelson, to answer the question posed by appellant, and further requested clarification from Dr. Vogelson.

Eighth, appellant contends that the trial court unreasonably limited his visitation rights. Specifically, appellant claims that the visitation schedule is severely limited in that

whether he changed diapers or did something eighty percent of the time versus forty percent of the time.
And I don't dispute that he genuinely loves his children and cares for his children. And he's the father. He is entitled to have a relationship with his children. I don't think you have to spend a lot of time on that.
N.T. April 9, 1987, at 107–108.

the schedule does not provide visitation for Christmas or Easter vacations, the children's birthdays, and national holidays; limits visitation during the children's summer vacations to two weeks; and requires appellee's written approval prior to removing the children from the Commonwealth. Appellant further asserts that this last limitation is unreasonable in light of the fact that appellant is a native of New York, his friends and family reside in New York, and appellee's cooperation will be difficult to secure as evidenced by appellee's interpretation of a previous order.

■ It " 'has long been against public policy to limit or destroy the relationship between parent and child.... Every parent has the right to develop a good relationship with the child, and every child has the right to develop a good relationship with both parents.' Therefore, to avoid unduly impinging upon a parent-child relationship, a court must sparingly impose restrictions on the relationship, ..., and must furthermore impose the least intrusive restriction(s) reasonably necessary to assure the child's welfare." *Fatemi v. Fatemi*, 339 Pa.Super. 590, 597, 489 A.2d 798, 802 (1985), quoting *Pamela J.K. v. Roger D.J.*, 277 Pa.Super. 579, 593, 419 A.2d 1301, 1309 (1980) (citation and footnote omitted). "[T]he party moving for the restriction on partial custody must show that the restriction is necessary to avoid detrimental impact on the child and that the content of the restriction manifests a reasonable relationship between the restriction and the avoidance of detrimental impact." *Id.* 339 Pa.Super. at 598, 489 A.2d at 802. The matter of scheduling, however, is best left to the discretion of the trial court. *See Rosenberg v. Rosenberg*, 350 Pa.Super. 268, 504 A.2d 350 (1986).

■ In the instant case, we find that the trial court did not abuse its discretion in framing a schedule whereby appellant has partial custody of the children on alternating weekends from 6:00 p.m. Friday until 7:00 p.m. on Sunday, Tuesday of mid-week dinner from 4:30 p.m. to 7:45 p.m., and for fifteen (15) uninterrupted days during the summer when

the children are not attending school. In addition, we find the condition that:

> [Appellant] shall not remove the children from the Commonwealth of Pennsylvania, *except when he visits his family in New Jersey*, without written approval of mother. *Such approval shall not be unreasonably withheld.*[33]

is supported by the record as reasonably necessary to assure the children's welfare. On March 30, 1987, Dr. Schechter testified that he approved of the current partial custody schedule that is the same schedule in the trial court's final order.[34] In addition, Dr. Schechter recommended that appellant's partial custody of the children be subject to certain conditions including the condition that appellant not remove the children outside the Commonwealth of Pennsylvania without appellant's consent.[35] We further note that appellant's concern regarding the possibility that appellee may unreasonably withhold approval in the future is unwarranted in light of the specified language in the trial court's order requiring that appellee's approval not be "unreasonably withheld." The trial court's order also enables appellant and his children to visit his family out-of-state.[36]

**33.** Trial court order of November 16, 1987, at 2 (emphasis added).

**34.** Dr. Schechter testified:
> In the best interest of the children, it would seem to me that the continuation of what was going on now might still be in their best interest since it's occasioned, and nothing has gone awry in terms of one measure of their success and their development. And that is, that at least academically, things are improving for both of them.
> N.T. March 30, 1987 at 16–17.

**35.** Dr. Schechter testified regarding the basis of his recommendation:
> I think that his impulse control certainly isn't that secure, that he necessarily could be expected not (sic) to maintain controls over that kind of impulse if he were especially angry, for example, at Dr. Schwarcz. I could imagine readily with the diagnosis that I have made and that Dr. Vogelson made, that this could occur.
> N.T. March 30, 1987 at 21.

**36.** Contrary to appellant's contention, perusal of the record indicates that appellant is a native of New Jersey, not New York, and that his sister resides in New Jersey.

■ Appellant's final contention is that the record reflects that the trial judge was prejudiced towards appellant, "resulting in reversible error." We find appellant's contention waived. On December 11, 1986, appellant filed a motion to recuse the trial judge; however, on March 24, 1987, in open court, appellant confirmed that he had withdrawn his motion by letter:

THE COURT: Before you proceed, there's one thing I wanted to put on the record. The last time we met in court we discussed [appellant's] motion for me to recuse myself. I've never officially ruled on that motion because I received a letter from [appellant] withdrawing that motion.

Is that correct?

[APPELLANT]: That's correct, your Honor.

N.T. March 24, 1987 at 6. Thus, the issue is waived. See *Reilly by Reilly v. Southeastern Pa. Transp.*, 507 Pa. 204, 489 A.2d 1291 (1985).

■ In any litigation, the failure to preserve an issue on appeal will be excused if there is a strong public interest that outweighs the need to protect the judicial system from improperly preserved issues. *Id.*, 507 Pa. at 223, 489 A.2d at 1301. We recognize the strong public interest in maintaining the public's trust in the ability of our courts to decide cases without bias or ill-will; however, we also reiterate our Supreme Court's concern as expressed in *Reilly* that "[c]harges of prejudice or unfairness made after trial expose the trial bench to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance." *Id.*, 507 Pa. at 225, 489 A.2d at 1301. In *Reilly*, the Court held that "[o]nce the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified and if he has waived that issue, he cannot be heard to complain following an unfavorable result." *Id.*, 507 Pa. at 222, 489 A.2d at 1300. We find these same policy concerns applicable in a custody proceeding and, therefore, hold that, once a custody order has been issued and a party has

waived his right to disqualify the trial judge, he cannot complain after the issuance of the order.[37]

ORDER AFFIRMED.

McEWEN, J., concurs in the result.

[37] The Court further held in *Reilly* that "recusal motions raised after verdict should be treated no different than other after-acquired evidence situations which compel the proponent to show that: 1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and 2) the existence of the evidence would have compelled a different result in the case." *Id.* 507 Pa. at 225, 489 A.2d at 1301. Instantly, appellant filed no motion subsequent to the issuance of the custody order. We, therefore, do not address this issue.