J-A19016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CHRISTIAN TOMKOSKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RACHEL CRITCHFIELD | : | No. 103 WDA 2025 |

Appeal from the Order Entered December 30, 2024
In the Court of Common Pleas of Cambria County
Civil Division at No: 2023-5203

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:                **FILED: October 7, 2025**

Appellant, Christian Tomkosky ("Father"), appeals from the December 30, 2024, order granting him partial custody of his seven-year-old child, A.T. A.T. was born to Father and Appellee, Rachel Critchfield ("Mother"), in 2017. Upon review, we affirm the trial court's order.

The parties were never married. Their relationship, which both describe as abusive and toxic, began 2009, when they were in high school, and ended in 2020. Their relationship ended after a violent altercation in April of 2020. Father was arrested and charged with aggravated assault and related offenses afterward, but Mother chose not to pursue the charges.

After their break-up the parties attempted to share custody of A.T. without court involvement. During that time, Mother had primary physical custody, with Father having custody on weekends and at other times by

agreement. Mother and A.T. live in Johnstown with Mother's parents ("Maternal Grandparents"). Father lives in Johnstown with his wife, Rachel Tomkosky ("Stepmother"), whom he married in 2023. As of the trial court's order, A.T. was in second grade at Divine Mercy Catholic School. The parties and Maternal Grandparents share the cost of tuition.

Father initiated this action with a complaint for custody on December 19, 2023. Father sought primary physical custody and sole legal custody of A.T. Pursuant to a March 1, 2024, interim order, the parties had shared legal custody and Mother had primary physical custody of A.T. In the order on appeal, the trial court granted the parties shared legal custody, with Mother having primary physical custody of A.T. and Father having partial physical custody on a seven-week rotating schedule. The order on appeal resulted in a slight increase to Father's custody of A.T. This timely appeal followed.

Father raises seven assertions of error:

I.   Did the trial court err in entering an unduly cumbersome seven (7) week custody schedule that is not workable for either party?

II.  Did the trial court commit an error of law in awarding [Father] partial physical custody, and [Mother] primary physical custody when presented with clear and uncontroverted evidence that Mother is not able to exercise primary physical custody, which is against the best interest of [A.T.] as Mother is a largely absent parent?

III. Did the trial court commit an error of law in prioritizing the relationship of third parties over the relationship of the parent with the minor child?

IV. Did the trial court fail to include a summer schedule or specific holiday schedule in the [custody order]?

V. Did the trial court commit an error of law in failing to consider the severity of the medical neglect, dental neglect, and educational deficiencies of the minor child in Mother's primary custody?

VI. Did the trial court rely on blatantly false information presented by Mother despite the physical evidence controverting the same being admitted?

VII. Did the trial court err in characterizing Father's behavior as revengeful when there was no evidence presented by either party of the same?

Father's Brief at 4-5.

We conduct our review in accordance with the following:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013). We observe that 23 Pa.C.S.A. § 5328 expressly mandates the consideration of a list of relevant factors, giving weight to those

that affect the child's safety. 23 Pa.C.S.A. § 5328(a). Thus, the factors set forth in § 5328(a) are not to be viewed in isolation. We therefore begin with a summary of the trial court's analysis of § 5328(a).

The trial court found that § 5328(a)(2.2)[1] favored Mother because of Father's previous violent assault of her. Trial Court Opinion 12/23/24, at 19-20. Regarding the assault, the trial court noted the following evidence:

> Father claims Mother was the instigator who refused to leave him alone when he attempted to separate himself from Mother in order to reduce tension. Mother claims that Father caused the situation to escalate by refusing to communicate with her. Essentially, Mother believed that Father was cheating on her with other women on this particular day because he was not responding to her and she could not locate him. When Mother finally confronted Father, he did not dispute Mother's claims. Mother did confront Father in a garage area where the parties lived. This altercation resulted in multiple separate confrontations with Mother going to the garage and then going back to the parties' residence. During these confrontations, both parties yelled at each other, hit one another, and threw things at one another. During the final confrontation, Mother appeared at the garage and brandished a gun. Father confiscated the gun from Mother and then assaulted Mother and burned her belongings in the parking lot. As the final part of the confrontation, it is alleged that Father shot the gun either in the air or in the direction of Mother in the window of the parties' home while he was burning Mother's belongings in the parking lot. The altercation resulted in the police being called and Father being arrested[.]

Trial Court Opinion, 12/23/24, at 3-4, ¶ 11 (footnote omitted).

---

[1] We are cognizant that § 5328 has been amended effective August 29, 2025. The statutory citations in this memo are to the version of the statute in effect at the time the trial court entered the order on appeal.

Under § 5823(2.3), the trial court found, based on the parties' past behavior, that Mother was more likely to encourage continued contact between the parties than Father. "While both parties clearly do not like one another, the record establishes that Mother has voluntarily permitted Father to have increased time with A.T. while Father appears desirous to take time away from Mother." *Id.* at 20. The court continued,

> [I]t appears to the court that Father is seeking primary physical custody and *sole legal custody* in order to inflict some level of revenge on Mother. A.T. has been primarily cared for by Mother and Maternal Grandparents during his formative years. A.T. has done well under the care of his Mother and Maternal Grandparents and the court struggles to understand Father's belief that awarding him primary physical custody will advance A.T.'s best interest. Uprooting A.T. from his primary home and modifying same for the sake of having primary physical custody seems to be more motivated to inflict harm on Mother rather than to improve A.T.'s life.

*Id.* at 21 (footnote omitted).

The trial court also concluded that A.T.'s need for stability and continuity in his education and family life (§ 5823(a)(4)) favored Mother, as A.T. had been in the custody of Mother, with help from Maternal Grandparents, for the previous four years. *Id.* at 22. The trial court found that § 5823(a)(5), regarding the availability of extended family, slightly favored Mother because of A.T.'s good relationship with Maternal Grandparents. *Id.* A.T. expressed a "very clear preference" for his current living situation; therefore § 5823(a)(7), which requires consideration of the child's preference, also favored Mother. *Id.* at 23. The remaining factors were either irrelevant or

neutral. Though the trial court did not find that any of the factors favored

Father, the trial court acknowledged Father's good characteristics:

> Father clearly loves A.T. and shows a genuine interest in maintaining a significant and meaningful relationship with him. Although Father acknowledged that he did not always seek more time with A.T. (because he believed that Mother would not grant same), he is now spending additional time with A.T. and desires to spend even more time with him. Father explains that he helps A.T. with his homework, he enjoys playing outside with A.T., and enjoys attending A.T.'s extra-curricular activities (such as baseball, graduation, etc.). In regards to Father's employment, Father states that employment as a bar owner allows him limitless flexibility to be present for A.T. at any time.

*Id.* at 23-24. Indeed, despite finding that each of the § 5328(a) factors either

weighed in favor of Mother or was neutral, the order on appeal increased the

amount of Father's physical custody time slightly.

Father argues, nonetheless, that the trial court erred in several

particulars. In his first argument, Father claims the trial court's custody order

being "unworkable," as it requires 21 custody exchanges during a seven-week

period, and for prioritizing Mother's work schedule (Mother is a corrections

officer at the Somerset County Prison) over A.T.'s best interests. Father

claims the frequent contact with Mother will entail more conflict between the

two which, in turn, will be detrimental to A.T.'s best interests. Father's Brief

at 20-21. Father argues, in essence, that the trial court erred in devising the

custody schedule because it requires an unattainable degree of cooperation

between the parties.

Father's argument is factually unfounded. The trial court found, and Father does not dispute, that **Maternal Grandparents** have handled the custody exchanges ever since Father's assault of Mother in April of 2020. Trial Court Opinion, 12/23/24, at 19. Further, the current order contains minor modifications to the routine the parties were following prior to this action. Trial Court Opinion, 2/14/25, at 2. Because there is no indication in the record that Mother is present for custody exchanges, there is no reason to include that the number of custody exchanges will result in increased conflict between the parties.

In his second argument, Father claims that the trial court should have awarded him primary custody because Mother is absent from A.T.'s life and Maternal Grandparents provide most of the care. Father claims Mother commonly leaves A.T. in the care of Maternal Grandparents because of Mother's work schedule. This argument is unavailing, as we have held that "a parent's work schedule may not deprive that parent of custody if suitable arrangements are made for the child's care in his or her absence." *Gerber v. Gerber*, 487 A.2d 413, 416 (Pa. Super. 1985).

The record supports the trial court's finding that leaving A.T. with Maternal Grandparents while Mother is at work is a suitable arrangement. Indeed, Father acknowledges that Maternal Grandparents take A.T. to activities such as baseball and boy scouts. Father's Brief at 23. Further, the trial court noted that Maternal Grandmother is a retired elementary school

teacher and thus able to help A.T. with his academic struggles. Trial Court Opinion, 12/23/24, at 22. Father's complaints about Maternal Grandparents is their age (early 70's) and the fact that on one occasion A.T. broke away from them and was bitten by a dog. Father's Brief at 24-25. Father offers nothing from which we can conclude that the trial court erred in weighing the § 5328(a) factors.

The trial court found that Maternal Grandparents established themselves as capable of caring for A.T. when Mother is not at home, and the trial court was unpersuaded by an isolated incident involving a dog bite. With regard to that incident, the trial court summarized the record as follows:

> 35. On or around June 4, 2024, A.T. was bitten by a dog while on a walk with Maternal Grandparents. A.T. had run ahead of Maternal Grandparents and gotten himself bitten by a dog in a fenced-in yard around 8:00 p.m. Once Mother learned of the bite from Maternal Grandparents, she called Father to advise him of the situation.

> 36. Father claims to have offered to take A.T. to the emergency room since Mother was at work at the time, but claims Mother would not give him 'permission' to take A.T. Because Father was not permitted to take A.T. to the doctor's office, A.T. was forced to wait 'hours' after the dog bite for Mother to return home. Father argues that he would have been able to get A.T. to a doctor's office faster than Mother if Mother had allowed him to take A.T. to the hospital.

> 37. Mother states she arrived home early from work and took A.T. to the emergency room around 9:45 p.m., meaning that A.T. had to wait less than two (2) hours after the dog bite. Mother described the injuries as minor 'puncture wounds' that 'looked worse than they actually were.'

> 38. In response to Father's assertion that she did not give him 'permission' to take A.T. to the doctor's office, Mother argues

that she did not refuse Father's officer, but explained that she was already in the process of leaving work early and offered to take A.T. to the doctor's office instead 'if [it was] okay with [Father].' Father responded that it was 'fine' with him that Mother take A.T., and Mother did not consider it a further issue.

Trial Court Opinion, 12/23/24, at 10-11, ¶¶ 35-38. The trial court found that the dog bite was accidental and not reflective of Maternal Grandparents' inability to care for A.T. *Id.* at 26 n.25. In summary, there is no evidence that Maternal Grandparents, by virtue of their age or because of an isolated incident involving a dog bite, are not a sufficient resource for A.T. while Mother is at work. Father's second argument fails.

In his third argument, Father argues that the trial court erred in prioritizing A.T.'s relationship with third parties (the Maternal Grandparents) over A.T.'s relationship with Father. Father notes the public policy favoring the development of a good relationship between parents and children. *See Schwarcz v. Schwarcz*, 548 A.2d 556, 571 (Pa. Super. 1988). But Father never explains how the order granting him partial custody violates that policy. This argument is simply a repackaging of his previous argument that Mother relies too heavily on Maternal Grandparents for assistance. In this iteration, Father argues that granting primary physical custody to Mother favors Maternal Grandparents over him. As we have already explained, Maternal Grandparents are a valuable source of care for A.T. while Mother is working. In the trial court's words, "Maternal Grandparents are in important reason why A.T. is not more affected by the behaviors of Mother and Father. Maternal

Grandparents serve as a buffer between the two parents and provide everyday consistency." Trial Court Opinion, 2/14/25, at 4. The fact that A.T. spends significant time with Maternal Grandparents does not establish any trial court error.

Next, Father challenges the trial court's failure to include a summer holiday schedule in its custody order. The trial court left it to the parties to arrive at an agreement for shared custody during the holidays. Father claims this portion of the order is inconsistent with the trial court's finding that the parties are unable to cooperate and coparent. Father's Brief at 31-32. Father argues that the trial court erred in forcing the parties to communicate and arrive at an agreed upon holiday schedule. Father cites no law in support of this argument and therefore he has waived it. Pa.R.A.P. 2119(b); **Estate of Haiko v. McGinley**, 799 A.2d 155, 161 (Pa. Super. 2002).

In his fifth argument, Father claims the trial court gave inadequate weight to what he describes as Mother's neglect of A.T.'s medical, dental, and educational needs. In particular, Father claims Maternal Grandparents dropped A.T. off for custody when he had pinkeye, and that Mother advised Father to use Visine rather than seek medical attention. Father also notes the dog bite incident discussed above; he claims Mother failed to schedule necessary follow up appointments after A.T. suffered a seizure; he claims A.T.'s dental care was overlooked until his teeth began to rot; and he claims A.T.'s performance in school is deficient under the care of Mother and Maternal

Grandparents. Father's Brief at 35-37. Father notes, correctly, that § 5328(a)

mandates weighted consideration of any factor affecting a child's safety.

Mother does not dispute that these factors affect A.T.'s safety.

But each of Father's assertions rests on a he said/she said account. The

trial court, after a thorough recitation of the pertinent testimony, found Mother

credible and Father not. As stated above, we defer to the trial court's

credibility determinations, though we are not bound by the inferences the

court draws from its findings of fact. **M.J.M.**, 63 A.3d at 334. With that in

mind, we set forth the trial court's recitation of the pertinent facts.

Regarding A.T. having pinkeye at a custody exchange, the trial court

noted the following:

> 19. The pinkeye incident occurred in December 2023. Father's recitation of the incident is that Maternal Grandparents dropped off A.T. at Father's home for his period of physical custody and he noticed that A.T. had what appeared to be pinkeye. Father contacted Mother, who responded that everything was alright and instructed him to 'wash it out.' Father felt Mother's response was insufficient and dismissive about A.T.'s condition. Father wanted to take A.T. to the doctor regarding the condition, but Mother advised that she would be home soon and she would take him to the doctor. Father perceived this as Mother wanting to control the situation with A.T. while Mother felt immediate action was not required and [she] would take A.T. to the medical clinic later. Father was also aggravated because he believed Mother was out of the house with her boyfriend and felt Mother was placing her interests before the needs of A.T.
>
> 20. Regarding this same pinkeye incident, Mother testified that she was at work when Maternal Grandparents informed her that A.T. appeared to have pinkeye, and that they attempted to 'flush it.' Mother claims to have notified Father shortly after she became aware of A.T.'s condition and offered to come home from work early to take A.T. to the doctor's office. In response, Mother

claims Father told her not to take A.T. to the doctor's office and to drop A.T. off with Father as scheduled, and he would 'take a look at it.' Mother claims that Father, at the time, recognized that A.T.'s pinkeye was not a medical emergency that required immediate attention because he took A.T. to a local bull riding event before his claim that the situation required immediate medical care. After some communication between the parties, Father decided it would be best to take A.T. to the doctor's office.

21. Father then took A.T. to the doctor's office at which time he learned that Mother had allowed A.T.'s health insurance to 'lapse,' meaning that A.T. was medically uninsured. The doctor prescribed medicated eye drops to A.T., and Father claims to have paid for the visit and the medication out of pocket. In response, Mother claims that once Father notified Mother of his decision to take A.T. to the doctor's office, she and Father discussed A.T.'s lack of medical insurance. Mother claims Father had previous knowledge of A.T.'s medical insurance lapsing.

22. Father claims he was unable to provide A.T. with medical insurance at that time because his employment does not provide medical insurance, and because he needed a copy of A.T.'s birth certificate which Mother allegedly refused to supply.

23. Mother added A.T. to her medical insurance in December 2023, and [Father's wife] added A.T. to her medical insurance in January 2024.

Trial Court Opinion, 12/23/24, at 6-7, ¶¶ 19-22.

Concerning A.T.'s seizure, the record reflects:

30. On April 20, 2024, A.T. experienced a seizure early in the morning (between 3:00 a.m. and 5:00 a.m.) while in Mother's custody. Mother attempted to contact Father to let him know that she would be taking A.T. to the hospital. Father did not respond. After taking him to the hospital, Mother was informed that A.T. would need to attend a follow-up appointment at UPMC Children's Hospital of Pittsburgh (hereinafter "Pittsburgh Children's Hospital").

31. Thereafter, Mother took A.T. for his follow-up appointment at Pittsburgh Children's Hospital, and Father did not attend. At his appointment, Mother was informed that A.T. would need more follow-up testing, including a 24-hour

- 12 -

Electroencephalogram (EEG), a 'normal' EEG, and a sedated Magnetic Resonance Imaging (MRI).

32. Between April 2024 and July 2024, Father contacted Mother to see if A.T.'s follow-up appointments had been scheduled. Father explained that he was concerned about the amount of time it was taking Mother to schedule A.T.'s tests, and was concerned about the potential impact it could have on A.T.'s health.

33. Mother scheduled the 24-hour EEG in July 2024, the normal EEG in August 2024, and the sedated MRI in October 2024. In response to Father's testimony, Mother explained that it was difficult to get a hold of the doctor's office due to her work schedule, and that she scheduled A.T.'s testing as soon as she was able. Mother also argued that all of A.T.'s testing was done in the time frame recommended by the doctor.

Trial Court Opinion, 12/23/24, at 9-10, ¶¶ 30-33 (footnotes omitted).

Finally, regarding A.T.'s dental condition, the trial court summarized the testimony as follows:

40. Father next describes an altercation between the parties regarding a dentist appointment. In March 2024, Father testified that A.T. had 'visibly rotten' teeth, and was concerned about the fact that A.T. had never been taken to a dentist by this point in time. Father notified Mother about his concerns, and Mother responded that A.T.'s pediatrician at Children's Pediatric Care was aware of the state of A.T.'s teeth.

41. Following Father's observation of A.T.'s teeth in March 2024, Father made a dentist appointment for A.T. on August 13, 2024. Father claims this appointment was the earliest he was able to schedule the appointment because of the 'months-long' waitlist at many local dentist's offices.

42. Father claims that after scheduling the dentist appointment for A.T., Mother reacted poorly and 'yelled at' Father for making the appointment. Father argues that Mother instructed him that she was to make all the necessary medical appointments and that he was not 'permitted' to make any appointments for A.T.

43. In response, Mother acknowledged that A.T. had dental issues, but argued that she had been taking him to Children's Pediatric Care for treatment of A.T.'s dental health. However, Mother explained that in May 2024, the pediatrician instructed her to schedule a dentist appointment for A.T. prior to him beginning the 2024-2025 school year. Although Mother claims to have had 'every intention' of scheduling a dentist appointment for A.T., she did not do so because A.T. had informed her that Father already scheduled a dentist appointment for him.

44. Mother also states that she and Father had a conversation about Father scheduling the appointment, but that it was 'not an argument' and she never forbade him from making medical appointments for A.T. Mother testified that she is unaware of any previous medical appointments scheduled by Father, and claims that Father was generally uninvolved in scheduling A.T.'s medical appointments.

Trial Court Opinion, 12/23/24, at 11-12, ¶¶ 40-44 (footnotes omitted).

The trial court found Father lacking in credibility and determined that his account of these events was an after-the-fact attempt recharacterization. "The court believes Mother's testimony that Father did not raise concerns about the handling of these medical situations as they were happening, and overall believes Mother is not neglecting A.T.'s health and believes the actions she took at the time to be appropriate." Trial Court Opinion, 12/23/24, at 25. Mother's testimony, summarized above and accepted as credible by the trial court, supports the trial court's findings. In particular, we note Mother's testimony that Father took A.T. to a bull riding event before taking him to get his pinkeye treated; that Father was aware of A.T.'s lapsed health insurance; and that Father had authority to schedule doctor's visits but did not. Father's fifth argument fails for lack of factual support.

Father next argues that the trial court erred in accepting Mother's testimony because it was demonstrably false in light of other evidence before the court. In specific, Father claims Mother was dishonest about the amount of time she has available to A.T. given her work schedule. Father offered the testimony of several witnesses who stated that when they see A.T. in public, he is always accompanied by one of the Maternal Grandparents and not by Mother. Father's Brief at 40-41. Father also claims the trial court disregarded Mother's role in escalating the confrontation that occurred in April of 2020. *Id.* at 41-42. Father also claims Mother was dishonest about her good relationship with Maternal Grandparents, citing evidence of tension between them. *Id.* at 42-43.

We decline to address this argument on the merits because the foregoing specifics were absent from Father's Pa.R.A.P. 1925(b) statement. In that document, Father asserted only that "[t]he trial court relied on blatantly false information presented by Mother despite the physical evidence controverting the same being admitted." Father's Pa.R.A.P. 1925(b) Statement, 1/16, 25, at ¶ 8. The trial court was unable to review this issue because Father failed to specify which portions of Mother's testimony he believed were demonstrably false. Trial Court Opinion, 2/14/25, at 6-7. Because Father's 1925(b) statement was so vague as to render trial court review impossible, we conclude this argument is waived on appeal. Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the

appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

With his seventh and final argument, Father asserts that the trial court erred in characterizing his conduct toward Mother as revengeful, as there was no evidence in support of that finding. In the court's own words, quoted above, the court believed Father wanted primary physical and sole legal custody to punish Mother rather than to benefit A.T. Trial Court Opinion, 12/23/24, at 21.

We discern no error in the trial court's characterization of the evidence. Both parties acknowledged the hostile and toxic nature of their relationship. The trial court explained in detail its reasons for concluding that A.T.'s best interests were served with Mother having primary physical custody, and we have already addressed the trial court's findings in detail above. We are not bound by the deductions and inferences the trial court draws from its findings of fact; the test is whether the court's conclusions are reasonable in light of the evidence of record. *M.J.M.* 63 A.3d at 334. Given the trial court's findings, supported in the record, that several of the § 5328(a) factors favored Mother while none favored Father, and given the ongoing hostility between the parties, the trial court's characterization of Father's conduct is reasonable in light of the record.

Because we have found each of Father's assertions of error to be lacking in merit, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  10/07/2025